## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Katelyn Robinson, *on behalf of herself and all others similarly situated*, | |
| Plaintiff, | Civil Action No.: |
| v. | **CLASS ACTION COMPLAINT** |
| Subaru of America, Inc., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Katelyn Robinson, by undersigned counsel, brings the following Class Action Complaint against Defendant Subaru of America, Inc. ("Defendant" or "Subaru"), and alleges, on her own behalf and on behalf of all those similarly situated, as follows:

### INTRODUCTION

1.     Plaintiff brings this lawsuit on behalf of herself and a proposed class of past and present owners and lessees of defective 2024 Subaru Crosstrek and 2024 Subaru Ascent vehicles (collectively the "Class Vehicles") marketed, distributed, sold, warranted, and serviced by Defendant.

2.     Plaintiff and the Class were damaged because the Class Vehicles contain defective side-view mirrors.

3.     Prior to selling the Class Vehicles to Plaintiff and class members, Defendant knew that the Class Vehicles contained a safety defect causing the driver-side mirror to shake and vibrate while the Class Vehicles are driven  (the "Mirror Defect" or the "Defect").  As a result of the Defect, the reflection of the road and other drivers in the driver-side mirror is distorted and drivers are unable to safely drive and observe traffic. The Mirror Defect is a result

of, *inter alia,* deficient materials used to make the mirror housing itself and/or a deficiency in the structure of the mirror housing.

4.    The Mirror Defect poses an extreme safety hazard to drivers and other operators because a vibrating mirror distorts the reflection of vehicles or objects behind or alongside the vehicle, which makes it difficult for a driver to accurately judge distances or identify potential hazards, especially at night, increasing the risk of accidents during lane changes or turns.  The constant movement of a vibrating mirror distracts drivers, causing them to take their eyes off the road; this is dangerous because even a minor distraction can lead to delayed reactions and increased chances of collisions. A vibrating mirror also fails to provide a clear image of the blind spots, which in turn poses danger to class members and other drivers when merging into traffic or changing lanes, as the driver may miss seeing vehicles or cyclists in adjacent lanes. Additionally, mirror vibrations exacerbate glare from headlights at night, making it even harder to see objects clearly, further increasing the potential for errors in judgment.

5.    Moreover, the Mirror Defect makes the Class Vehicles non-compliant with Federal Motor Vehicle Safety Standard ("FMVSS") No. 111, issued by the National Highway Traffic Safety Administration ("NHTSA"), which sets specific requirements to ensure the driver's visibility of the road behind and to the sides of the vehicle and mandates driver-side mirrors must provide a clear, undistorted view of the highway to the rear of the vehicle along the driver's side, and mirrors must minimize glare from headlights of vehicles behind the driver at night, ensuring safe nighttime driving conditions.

6.    To date, Subaru has failed to correct the safety defect under Subaru's warranty, requiring that Class Vehicle owners continue to operate their vehicles with the safety defect. Indeed, Subaru has not issued any adequate repairs to its dealers, has not issued a safety recall,

and at most Subaru replaces defective mirrors with the same defective part which does not fix the issue:

- NHTSA Complaint No. 11601634 (2024 Subaru Ascent), July 12, 2024 (Incident Date January 25, 2024): Driver's side mirror demonstrates excessive shaking as compared to passenger side. Housing has been replaced but no change. Visually difficult for me to use that mirror at times.

7.      Further, the Mirror Defect often manifests immediately after Class Members take ownership of the vehicles and Class Vehicle owners, including the Plaintiff, have complained that they experienced the Mirror Defect within weeks of acquiring their vehicles:

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still ha snot been found. **The driver-side mirror has had this issue since the car was purchased.**

8.      Despite having pre-sale knowledge of the Defect, Subaru failed to disclose it to Plaintiff and other class members at the time of purchase or lease.  Had it done so, Plaintiff and class members would not have purchased the Class Vehicles or would have paid substantially less for them.

9.      Subaru's conduct is in violation of the Texas's Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.*, and constitutes fraudulent concealment, unjust enrichment, and a breach of express and implied warranties.

10.     Subaru has and will continue to benefit from its unlawful conduct – by selling more vehicles, at a higher price, and avoiding warranty obligations – while consumers are harmed at the point of sale as their vehicles continue to suffer from the unremedied Mirror Defect.

11.    To remedy Subaru's unlawful conduct, Plaintiff, on behalf of herself and putative class members, seeks damages and restitution from Subaru, as well as notification to class members about the defect.

**PARTIES**

12.    Plaintiff Katelyn Robinson ("Ms. Robinson" or "Plaintiff") is an adult individual residing in New Braunfels, Texas.

13.    Defendant Subaru of America, Inc. ("Subaru" or "Defendant"), is a New Jersey business entity with a principal place of business at 2235 Marlton Pike West, Cherry Hill, New Jersey 08002.  The Defendant is in the business of marketing, supplying, and selling motor vehicles accompanied by written warranties to the public at large through a system of authorized dealerships.

14.    At all times herein mentioned,  Defendant reviews and analyzes warranty data submitted by Defendant's dealerships and authorized technicians in order to identify defect trends in vehicles.  Upon information and belief,  Defendant dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendant decides to audit the dealership. Defendant uses this information to determine whether particular repairs are covered by an applicable Subaru warranty or are indicative of a pervasive defect.

15.    Defendant also developed the marketing materials to which Plaintiff and the Class were exposed, owner's manuals, informational brochures, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Mirror Defect.

4

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Class Members, and Defendant are citizens of different states.

17.    Personal jurisdiction and venue are proper in this District as Defendant is headquartered in this District.

## FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFF

18.    On July 15, 2024, Ms. Robinson, a resident of Texas, purchased a new 2024 Subaru Crosstrek, Vehicle Identification Number JF2GUADC0RH378154 (hereafter the "Robinson Vehicle") from Gillman Subaru in Selma, Texas (hereafter "Gillman Subaru"), Defendant's authorized dealership.

19.    Ms. Robinson paid $30,027.00, plus taxes, fees, and other charges, for the Robinson Vehicle.

20.    Passenger safety and reliability were important factors to Ms. Robinson's decision to purchase the vehicle. Prior to purchasing the 2024 Subaru Crosstrek, Ms. Robinson researched the vehicle by visiting Gillman Subaru and reviewing Subaru Crosstrek specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles. Based on Subaru's and its authorized dealership's representations, Ms. Robinson was led to believe that the 2024 Subaru Crosstrek was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced her to purchase the vehicle.

21.     Prior to the purchase, Gillman Subaru assured Ms. Robinson that the Robinson Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

22.     In its New Vehicle Limited Warranty Land Rover promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

23.     Despite Ms. Robinson's research prior to purchasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of purchase that the 2024 Subaru Crosstrek contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Ms. Robinson was not aware of, and did not have any reason to anticipate, that her vehicle was afflicted by the Mirror Defect when she purchased the vehicle.

24.     Subaru's omissions were material to Ms. Robinson.  If Subaru had adequately disclosed these facts before Ms. Robinson purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle had she known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

25.     Soon after Ms. Robinson took delivery of the Robinson Vehicle, she observed the vehicle's diver-side mirror shook and vibrated while the driving at speed or on the highway, causing the reflection in the driver-side mirror to appear blurry and impeding her ability to observe traffic.

26.     On August 6, 2024, within a month of purchase and with the vehicle's odometer reading under 900 miles, Ms. Robinson returned her vehicle to Gillman Subaru and complained about the driver-side mirror shaking.

27.     Gillman Subaru inspected the Robinson Vehicle and placed a special order for a replacement driver-side mirror.

28.     On August 15, 2024, Ms. Robinson returned her vehicle to Gillman Subaru once she was informed the replacement part had arrived.

29.     During that visit, Gillman Subaru verified Plaintiff's diver-side mirror shaking complaint and replaced the driver-side mirror assembly.

30.     However, the repair attempt did not correct the Defect. Following the repair, the driver-side mirror continued to shake when driving at speed.

31.     On August 19, 2024, Ms. Robinson returned her vehicle to Gillman Subaru and complained again that the vehicle's driver-side mirror still shook while driving, causing the image in the driver-side mirror to become distorted and impeding her ability to observe traffic.

32.     Gillam Subaru responded there was nothing else it could do for the Plaintiff and refused to undertake any further repairs.

33.     On September 12, 2024, Ms. Robinson, through her counsel, sent a letter to Subaru advising it that the Robinson Vehicle suffered from the Mirror Defect and that Ms. Robinson was denied a repair under Subaru's warranty.

34.     To date, the Robinson Vehicle remains unrepaired and its driver-side mirror continues to shake and vibrate when driving and is unrepaired, and impedes Plaintiff's ability to safely operate the Vehicle.

## FACTUAL ALLEGATIONS APPLICABLE TO PLAINTIFF AND THE CLASS

**I.    The Mirror Defect**

35.     The Subaru Crosstrek is a small crossover vehicle that was completely redesigned for the 2024 model year.

36.     The Subaru Ascent is a midsize three-row crossover vehicle. Subaru redesigned its side mirror assembly for the 2024 model year.

37.     Subaru has sold tens of thousands of 2024 Subaru Crosstrek and 2024 Subaru Ascent Class Vehicles across the United States and in Texas.

38.     Subaru has affirmatively represented that its Class Vehicles are safe and tough.[1] For example, on its website Subaru touts that the 2024 Crosstrek is "completely redesigned," with "upgraded cutting-edge technology, enhanced safety, and more rugged style."[2]

39.     Likewise, on its website Subaru touts the 2024 Ascent as a safe and dependable vehicle.[3]

40.     The Class Vehicles suffer from the Mirror Defect.  Specifically, as a result of the way the vehicles' mirror housings are manufactured and/or made and the use of deficient materials, the Class Vehicles' driver-side mirror mounting points are not sufficiently strong and rigid for normal driving conditions and their intended use, and as a result the driver-side mirrors shake and vibrate when driving under normal conditions.

41.     As set forth in the consumer complaints below, both Crosstrek and Ascent owners report the glass within the mirror assembly shakes and vibrates while driving.

42.     The Mirror Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on rearward visibility.

43.     Specifically, the Defect poses an extreme safety hazard to drivers and other operators because a vibrating mirror distorts the reflection of vehicles or objects behind or alongside the car, which makes it difficult for a driver to accurately judge distances or identify potential hazards, especially at night, increasing the risk of accidents during lane changes or

---

[1] https://www.subaru.com/vehicles/crosstrek.html (last visited September 19, 2024).
[2] https://www.subaru.com/vehicles/crosstrek/features.html (last visited September 19, 2024).
[3] https://www.subaru.com/vehicles/ascent/features.html (last visited September 19, 2024).

turns.  The constant movement of a vibrating mirror distracts the driver, causing them to take their eyes off the road, and even a minor distraction can lead to delayed reactions and increased chances of collisions. A vibrating mirror fails to provide a clear image of blind spots, which in turn poses danger when merging into traffic or changing lanes, as the driver may miss seeing vehicles or cyclists in adjacent lanes.  Furthermore, mirror vibrations exacerbate glare from headlights at night, making it even harder to see objects clearly, increasing the potential for errors in judgment.

44.    Moreover, the Mirror Defect makes the Class Vehicles non-compliant with Federal Motor Vehicle Safety Standard No. 111, issued by the National Highway Traffic Safety Administration, which sets specific requirements to ensure the driver's visibility of the road behind and to the sides of the vehicle and mandates that driver-side mirrors must provide a clear, undistorted view of the highway to the rear of the vehicle along the driver's side, and mirrors must minimize glare from headlights of vehicles behind the driver at night, ensuring safe nighttime driving conditions.

45.    Further,  Subaru refuses to repair the Mirror Defect under its written warranty when given a reasonable opportunity to do so, or replaces defective driver-side mirror assembly with the same defective parts that fail to cure the Defect.

46.    Subaru has long known that its driver-side mirrors will vibrate due to defective mounting.  For instance in December 2015 it issued Technical Service Bulletin, No. 12-195-15, which addressed complaints about " vibration or looseness in either of the door mirrors" because mirrors were insufficiently secured to the vehicles.

47.    However, Subaru has not issued any bulletins or instructions to its dealerships regarding the Class Vehicle's defective driver-side mirrors or repairing the same.

48.     The Mirror Defect can and often does manifest immediately after Class Members take ownership of the vehicles and Class Vehicle owners, including the Plaintiff, have complained that they experienced the Mirror Defect within weeks of acquiring their vehicles:

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still ha snot been found. **The driver-side mirror has had this issue since the car was purchased.**

49.     Furthermore, when driver-side mirror repairs are performed by Defendant's dealers, defective mirrors are merely replaced with other defective mirrors:

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still ha snot been found. **The driver-side mirror has had this issue since the car was purchased.**

50.     Subaru had and has a duty to fully disclose the true nature of the Mirror Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Subaru had and has exclusive knowledge or access to material facts about the Class Vehicles' driver-side mirrors that were and are not known to or reasonably discoverable by Plaintiff and the other Class Members; and because Subaru has actively concealed the Mirror Defect from its customers.

II.    **Subaru's Knowledge of the Defect**

51.    Before Subaru sold Plaintiff her Class Vehicle, Subaru was on notice that the Class Vehicles suffered from the Mirror Defect, however Subaru failed to disclose the existence of the defect to Plaintiff or any other Class Vehicle owner.

52.    Subaru became aware of the Mirror Defect through sources not available to Plaintiff and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Subaru's network of dealers and directly to Subaru, aggregate warranty data compiled from Subaru's network of dealers, testing conducted by Subaru in response to consumer complaints, and repair order and parts data received by Subaru from Subaru's network of dealers.

53.    On information and belief, during the pre-release process of designing, manufacturing, engineering, and performing durability testing on the Class Vehicles, which would have likely occurred between 2022 and Spring 2023 before Subaru began selling the Class Vehicles in 2023 (Crosstrek in Spring 2023 and Ascent in Fall 2023), Subaru necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' driver-side mirrors: the types and properties of materials used to make them, including their durability and whether those materials were sufficiently sturdy and rigid to prevent driver-side mirrors from shaking and vibrating when driving; the basic engineering principles behind their construction; the forces and stresses the driver-side mirrors would face; when and how the driver-side mirrors would fail; and the cumulative and specific impacts on the driver-side mirrors caused by wear and use, the passage of time, and environmental factors.

54.     An adequate pre-release analysis of the design, engineering, and manufacture of the driver-side mirrors used for the Class Vehicles would have revealed to Subaru that as a result of the manner in which the driver-side mirrors were made, assembled, and mounted, and the materials used, the driver-side mirrors were insufficiently sturdy and rigid for the intended use. Thus, during the pre-release analysis stage of the Class Vehicles, Subaru would have known that the driver-side mirrors installed in Class Vehicles were defective, would shake and vibrate when driving, and would pose a safety risk to owners/lessees and the motoring public. Despite that such testing on the Class Vehicles revealed the Mirror Defect to Subaru, Subaru failed to remedy the manufacturing processes with the Class Vehicles before putting the vehicles into production and selling them to the public.

55.     Subaru also learned about the Mirror Defect because of the higher-than-expected number of replacement driver-side mirrors ordered from Subaru, which alerted Subaru that the mirrors are defective. Subaru service centers use Subaru replacement parts that they order directly from Subaru. Therefore, Subaru has detailed and accurate data regarding the number and frequency of replacement part orders, including replacement driver-side mirrors. The ongoing sales of replacement driver-side mirrors and the fact that driver-side mirrors were being ordered at such high rates (and at rates higher than driver-side mirrors for other Subaru vehicles), was known to Subaru and would have alerted Subaru that its driver-side mirrors were defective and posed a safety risk early on.

56.     Subaru also knew about the Mirror Defect because numerous consumer complaints regarding driver-side mirrors shaking and vibrating were made directly Subaru and its dealerships. The large number of complaints, and the consistency of their descriptions of driver-side mirrors shaking and vibrating alerted Subaru to this serious Defect affecting the Class

Vehicles.  The full universe of complaints made directly to Subaru about the Mirror Defect is information presently in the exclusive custody and control of Subaru and is not yet available to Plaintiff prior to discovery.  However, upon information and belief, many Class Vehicle owners, including the Plaintiff, complained directly to Subaru and Subaru dealerships and service centers about the ongoing shaking and vibration of driver-side mirrors in their vehicles.

57.    Because the Mirror Defect can and does manifest almost immediately – often within weeks of the Class Vehicles first being driven – Subaru began receiving notification of the higher-than-expected number of replacement driver-side mirrors ordered from Subaru and consumer complaints regarding driver-side mirrors failure within weeks after Subaru began selling the Class Vehicles in 2023 (Crosstrek in Spring 2023 and Ascent in Fall 2023).

### III.    The NHTSA Complaints and Online Discussions of the Defect

58.    Upon information and belief, thousands of purchasers and lessees of the Class Vehicles have experienced the Mirror Defect.  Given how widespread the issue is and the fact that Mirror Defect manifests within weeks of the Class Vehicles sale, Class Vehicle owners have been complaining about the Mirror Defect directly to Subaru since 2023 and have been posting such complaints online since at least Fall 2023.

59.    Automobile manufacturer and distributors, including Subaru, regularly monitor social media for vehicle owners concerns.  Upon information and belief, Subaru maintains presence on and regularly monitors social media for such content too, has done so since it began selling the Class Vehicles, and published social media user guidelines on its website.[4]

60.    Through its monitoring of social media, Subaru learned about the Defect.

---

[4] https://www.subaru.com/support/privacy-policies.html (last visited September 19, 2024).

61.    For instance on www.subaruxvforum.com, a Subaru Crosstrek vehicle enthusiast website that upon information and belief Subaru regularly monitors, a November 5, 2023 post written by a Class Vehicle owner complained of "the glass of the driver side mirror vibrating at highway speed or uneven pavement," that it is the glass within the mirror assembly, and not the assembly itself, that vibrates, and a replacement driver-side mirror assembly has not resolved the problem.[5]  Fourteen other Class Vehicle owners responded that they had near-identical experiences.

62.    On Reddit, Crosstrek Class Vehicle owners also shared that they had near-identical experiences; one owner complained in September 2023 that he "noticed a lot of shaking in the glass itself on the driver side mirror. [he] took it into [his] dealership […] to get it fixed but they told me that it was normal and by design which baffles [him] since it doesn't do it on the right side."[6]  In response, other Class Vehicle owners complained experiencing the same Defect, and receiving a replacement driver-side mirror, but "[n]ew driver's side mirror vibrates just as bad."[7]  In another Reddit thread, Class Vehicle Owners likewise share their complaints about driver-side mirrors shaking and that replacement mirror did not resolve the Defect.[8]

---

[5] https://www.subaruxvforum.com/threads/driver-side-mirror-glass-vibration.187158 (last visited September 19, 2024).

[6] https://www.reddit.com/r/Crosstrek/comments/17fm7f9/anyone_elses_driver_side_mirror_shaking_in_their/?rdt=36691 (last visited September 19, 2024).

[7] *Id.*

[8] https://www.reddit.com/r/Crosstrek/comments/14sp2hk/comment/jr8wyli/?utm_source=share&utm_medium=ios_app&utm_name=ioscss&utm_content=1&utm_term=1&context=3 (last visited September 19, 2024). *See also* https://www.reddit.com/r/Crosstrek/comments/15rym1w/driver_side_mirror_shakes_at_high_speeds/ (last visited September 19, 2024); *see also* https://www.reddit.com/r/Crosstrek/comments/1asv7v2/driver_side_mirror_shaking_blurry_vibrating_on/ (last visited September 19, 2024).

63.     Similarly, many Ascent Class Vehicles owners expressed their frustration on Reddit; one owner shared in May 2024 how in her "Ascent with less than 1000 miles […] driver side rearview mirror shakes considerably which makes it distracting when driving on the highway," but dealer offered no repair claiming such was "normal."[9]

64.     Likewise, Ascent Class Vehicles owners voiced their frustration about the Defect on the Ascent enthusiast forums.[10]  For example, one Ascent owner wrote she "[t]ook [car] into service today and they confirmed the vibration/shaking," "[t]hey replaced the entire mirror housing," but "as soon as [she] get on the road [she] notice it is actually worse now making the mirror almost unusable at highway speeds." Same owner said "[t]he mirror housing appears to be fine, but the glass is what is really loose and vibrates like crazy."[11]

65.     Similarly, on Facebook, Class Vehicle owners have been complaining about the Mirror Defect, since Subaru began selling the vehicles.  For instance, on April 29, 2024, one Ascent Class Vehicle owner published a post stating, "'24 Ascent with vibration in the driver side mirror that increases with speed. Minimal complaint, but a brand new car shouldn't have this issue. Subaru dealer replaced the glass and housing but the vibration remains."[12]  In response to original poster's question whether other owners experienced the same issue, several other Class Vehicle owners reported they did and replacement mirror did not resolve the problem.

66.     Moreover, Subaru monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA"). Federal law requires automakers like Subaru to be in

---

[9]

https://www.reddit.com/r/SubaruAscent/comments/1d1qxzs/driverside_rearview_mirror_shakes/ (last visited September 19, 2024).
[10] https://www.ascentforums.com/threads/driver-side-mirror-vibration-how-to-fix.21549/ (last visited September 19, 2024).
[11] *Id*.
[12] https://www.facebook.com/share/p/u6nW5NB9Xz9mhYZc/ (last visited September 19, 2024).

close contact with NHTSA regarding potential auto defects, including imposing a legal

requirement (backed by criminal penalties) compelling the confidential disclosure of defects and

related data by automakers to NHTSA, including field reports, customer complaints, and

warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

67.    Automakers also have a legal obligation to identify and report emerging safety-

related defects to NHTSA under the Early Warning Reporting Requirements. *Id*. Similarly,

automakers monitor NHTSA databases for consumer complaints regarding their automobiles as

part of their ongoing obligation to identify potential defects in their vehicles, including safety-

related defects. *Id*.  Thus, Subaru knew or should have known of the many complaints about the

Mirror Defect logged by NHTSA ODI, and the content, consistency, and large number of those

complaints alerted, or should have alerted, Subaru to the Mirror Defect.

68.    The below example complaints concerning 2024 Subaru Crosstrek and 2024

Subaru Ascent vehicles, filed by consumers with the NHTSA and posted on the Internet, which

on information and belief Subaru actively monitored during the relevant time period,

demonstrate that the Defect is widespread and dangerous, and that Subaru has known about the

defect at all relevant times:

- NHTSA Complaint No. 11585962 (2024 Subaru Ascent), April 29, 2024 (Incident Date April 12, 2024): Driver side mirror has vibration that increases with speed. At highway speeds, it is difficult to safely see the lane next to you, especially if there is a vehicle behind you with their headlights on. The vehicle's mirror glass and housing were replaced and the vibration remains. There is no observable vibration with the passenger side mirror. Was advised by a local dealership that there is no more they can do to eliminate the vibration.

- NHTSA Complaint No. 11593853 (2024 Subaru Crosstrek), June 12, 2024 (Incident Date May 6, 2024): Driver's Outside mirror shaking at highway speeds. Massive blur, headlights "dance" around, quite distracting and disorienting when checking for safe lane changes. Took brand new (less than 400 mile) 2024 Crosstrek Limited into local dealer to report buzzy left mirror. They took a look at

it. Received this report: (Tech) said the mirror glass itself does shake but that is going to be normal because of how the mirror glass sits in the housing...according to our tech the vehicle is operating as designed I'm sorry, there's no way that a mirror should be shaking like that. The inside rearview mirror is pristine. The passenger side doesn't shake. It's the driver's mirror and now two Subaru employees have confirmed some shake, but won't do anything about it. This is a safety issue. It's starting to get traction on Reddit. [XXX] To avoid headaches, I have to tilt the mirror down to keep dancing lights from affecting my vision. This is a safety issue that needs to be addressed. I was hoping that it would happen at a local dealer lever, but apparently, it might take submitting to the NHTSA. It's a great car, just has this particular issue.

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), June 18, 2024 (Incident Date June 1, 2024): The driver-side mirror vibrates and shakes excessively on rough roads or at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and replaced the mirror but was unable to fix it, stating that nothing else can be done. The driver-side mirror has had this issue since the car was delivered from the dealer.

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still ha snot been found. The driver-side mirror has had this issue since the car was purchased.

- NHTSA Complaint No. 11599869 (2024 Subaru Crosstrek), July 7, 2024 (Incident Date June 29, 2024): In speeds above 50 mph, the drivers side mirror shakes and vibrates. This causes the picture to be extremely blurry, and makes it hard to discern other cars. I believe it to be a very real visibility issue for highway driving.

- NHTSA Complaint No. 11601634 (2024 Subaru Ascent), July 12, 2024 (Incident Date January 25, 2024): Driver's side mirror demonstrates excessive shaking as compared to passenger side. Housing has been replaced but no change. Visually difficult for me to use that mirror at times.

- NHTSA Complaint No. 11601636 (2024 Subaru Ascent), July 12, 2024 (Incident Date June 16, 2024): In my new 2024 Ascent, there's a vibration in the driver side

mirror that gets worse as speed increases. It's a minor issue, but it's disappointing for a brand new car to have this problem. The Subaru dealer hasn't taken any action despite being informed about it, and the vibration persists.

- NHTSA Complaint No. 11606122 (2024 Subaru Ascent), August 2, 2024 (Incident Date March 30, 2024): Driver side mirror vibration, per dealer and manufacturer, this is a known issue with no fix released yet.

69.    By contrast, NHTSA shows zero complaints of mirror shaking in 2024 Subaru vehicles other than Crosstrek and Ascent, zero complaints of mirror shaking in 2021-2023 Subaru vehicles, and in the year 2020 only one mirror shaking complaint in the Subaru Ascent vehicle. Thus the volume and frequency of such complaints for the Class Vehicles, especially when compared to other Subaru vehicles, alerted Subaru that the Class Vehicles suffered from defective driver-side mirrors.

70.    Although Subaru was aware of the widespread nature of the Mirror Defect in the Class Vehicles, and that it posed grave safety risks, Subaru has failed to take adequate steps to notify all Class Vehicle owners of the Defect and provide relief.

71.    Customers have reported the Mirror Defect in the Class Vehicles to Subaru directly and through its dealers.  Defendant is fully aware of the Mirror Defect contained in the Class Vehicles.  Moreover, Defendant had the ability to notify Class Vehicle owners about the Mirror Defect directly and via its authorized dealerships at the time of sale and thereafter. Nevertheless, Defendant actively concealed the existence and nature of the Defect from Plaintiff and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendant:

a.    failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Mirror Defect;

18

b. failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their driver-side mirrors were not in good working order, were defective, and were not fit for their intended purpose; and,

c. failed to disclose and/or actively concealed the fact that the Class Vehicles and their driver-side mirrors were defective, despite the fact that Defendant learned of the Mirror Defect as early as 2022.

72. Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to take other remedial measures related to the Mirror Defect contained in the Class Vehicles.

73. Defendant has not recalled the Class Vehicles to repair the Mirror Defect, has not issued any bulletins or instructions to its dealerships regarding the Mirror Defect, has not offered to its customers a suitable repair or replacement of parts related to the Mirror Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Mirror Defect.

74. Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

75. As a result of the Mirror Defect, the value of the Class Vehicles were worth less money at the time of sale.

76. Reasonable consumers, like Plaintiff, expect and assume that a vehicle's driver-side mirror is not defective and will not shake or vibrate under normal driving conditions. Plaintiff and Class Members further expect and assume that Subaru will not sell or lease vehicles with known safety defects, such as the Mirror Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair. They do not expect that

Subaru would fail to disclose the Mirror Defect to them, and then refused to remedy the defect under Subaru's warranty.

## CLASS ACTION ALLEGATIONS

### A. *The Class*

77.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(5), Plaintiff seeks to represent the following class:

> **Texas Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent vehicle in the State of Texas (the "Texas Class")

78.     Defendant and its employees or agents are excluded from the Class.

### B. *Numerosity*

79.     Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Vehicles have been sold and leased nationwide and throughout Texas.

### C. *Common Questions of Law and Fact*

80.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.  These questions include:

a.     whether the Class Vehicles suffer from the Mirror Defect;

b.     whether the Mirror Defect constitutes an unreasonable safety hazard;

c.     whether Defendant knows about the Mirror Defect and, if so, how long Defendant has known of the Defect;

d.     whether the defective nature of the Class Vehicles' driver-side mirrors constitutes a material defect;

e.      whether Defendant had and has a duty to disclose the defective nature of the Class

Vehicles' driver-side mirrors to Plaintiff and the other Class Members;

f.      whether Plaintiff and the other Class Members are entitled to equitable relief,

including, but not limited to, a preliminary and/or permanent injunction;

g.      whether Defendant knew or reasonably should have known of the Mirror Defect

contained in the Class Vehicles before it sold or leased them to Class Members;

and

h.      Whether Defendant breached its express warranty and the implied warranty of

merchantability, engaged in fraudulent concealment and unjust enrichment, and

whether Defendant violated the Texas Deceptive Practices Act,

Tex. Bus. & Com. Code § 17.41, *et seq.*

### D.   *Typicality*

81.    The Plaintiff's claims are typical of the claims of the Class since Plaintiff purchased or leased defective Class Vehicles, as did each member of the Class. Furthermore, Plaintiff and all members of the Class sustained economic injuries arising out of Defendant's wrongful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent Class members.

### E.   *Protecting the Interests of the Class Members*

82.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in handling class actions and claims involving unlawful business practices.  Neither Plaintiff nor her counsel has any interest which might cause them not to vigorously pursue this action.

**F.** *Proceeding Via Class Action is Superior and Advisable*

83.    A class action is the superior method for the fair and efficient adjudication of this controversy.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

84.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**Fraudulent Concealment**
**(On behalf of Plaintiff and the Class)**

85.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

86.    By affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' driver-side mirror

from Plaintiff and Class Members, Subaru concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

87.     Defendant knew that the Class Vehicles' driver-side mirrors suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

88.     Defendant was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles' driver-side mirrors and/or the associated repair costs because:

a.     Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' driver-side mirrors;

b.     Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.     Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their driver-side mirrors have a dangerous safety defect until after they purchased the Class Vehicles; and,

d.     Defendant knew that Plaintiff and the Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

89.     On information and belief, Subaru still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Mirror Defect and the performance and quality of Class Vehicles.

90.     The facts concealed or not disclosed by Defendant to Plaintiff and Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

91.     Plaintiff and Class Members relied on Defendant to disclose material information it knew, such as the defective nature of the driver-side mirrors in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

92.     By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

93.     The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

94.     Had Plaintiff and other Class Members known that the Class Vehicles suffer from the Mirror Defect, they would not have purchased the Class Vehicles or would have paid less for them.

95.     Plaintiff and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

96.     As a result of Defendant's misconduct, Plaintiff and the other Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement parts and are worth less money because of the Defect.

97.     Accordingly, Subaru is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

98.     Subaru's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-

being, to enrich Subaru.  Subaru's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

99.     Furthermore, as the intended and expected result of its fraud and conscious wrongdoing,  Subaru has profited and benefited from Plaintiff's and Class Members' purchase of Class Vehicles containing the Mirror Defect.  Subaru has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of Subaru's misconduct alleged herein, Plaintiff and Class Members were not receiving vehicles of the quality, nature, fitness, or value that had been represented by Subaru, and that a reasonable consumer would expect.

100.    Subaru has been unjustly enriched by its fraudulent, deceptive, and otherwise unlawful conduct in connection with the sale and lease of Class Vehicles and by withholding benefits from Plaintiff and Class Members at the expense of these parties. Equity and good conscience militate against permitting Subaru to retain these profits and benefits, and Subaru should be required to make restitution of its ill-gotten gains resulting from the conduct alleged herein.

101.    Plaintiff seeks damages and injunctive and equitable relief for herself and for the Class.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

102.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

103.    Subaru has long known that about the Mirror Defect which it concealed and failed to disclose to Plaintiff and Class Members.

104.    As a result of its fraudulent acts and omissions related to the Mirror Defect, Subaru obtained monies which rightfully belong to Plaintiff and the Class Members to the detriment of Plaintiff and Class Members.

105.    Subaru appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the proposed Class Members who, without knowledge of the Mirror Defect, paid a higher price for their vehicles which actually had lower values.  Subaru also received monies for vehicles that Plaintiff and the Class Members would not have otherwise purchased or leased.

106.    It would be inequitable and unjust for Subaru to retain these wrongfully obtained profits.

107.    Subaru's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

108.    As a result of Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

109.    Plaintiff does not seek restitution under their Unjust Enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

110.    Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with misleading information concerning the Mirror Defect; compelling Defendant to provide Class members with adequate

repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**THIRD CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability Pursuant to the**
**Tex. Bus. & Com. Code § 2.314**
**(On behalf of Plaintiff and the Class)**

111.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

112.    Defendant is a merchant with respect to motor vehicles.

113.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff and to Class Members.

114.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

115.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the Mirror Defect referenced herein and thus were not in merchantable condition when Plaintiff and Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles were purchased or leased to be used.  Specifically, the Class Vehicles suffer from driver-side mirrors that vibrate, causing the reflection in the driver-side mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

116.     As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

<u>FOURTH CAUSE OF ACTION</u>
**Breach of Express Warranty under Tex. Bus. & Com. Code Ann. § 2.313**
**(On behalf of Plaintiff and the Class)**

117.     Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

118.     In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff and Class Members with its New Vehicle Limited Warranty where it promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes first.

119.     Plaintiff and Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

120.     Plaintiff and Class Members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class Member, by failing to repair the Mirror Defect under the vehicle's warranty within a reasonable period of time as described herein.

121.     Plaintiff and Class Members have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

122.     As a result of said nonconformities, Plaintiff and Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

123.    Plaintiff and Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff and Class Members' acceptance of the Class Vehicles.

124.    Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Tow Harness Module Defect.

125.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff and Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

## FIFTH CAUSE OF ACTION
### Violation of the Texas Deceptive Practices Act,
### Tex. Bus. & Com. Code § 17.41, *et seq.*
### (On behalf of Plaintiff and the Class)

126.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

127.    Plaintiff and Class Members are each "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired their vehicle by purchase.

128.    Plaintiff's vehicle and Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattel that were purchased or leased for use.

129.    Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

29

130.    At all relevant times, Defendant has engaged in "Trade" and "Commerce" as defined by Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

131.    Texas's Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*, prohibits and declares unlawful false, misleading, or deceptive business practices. in the conduct of any trade or commerce.

132.    Specifically, by affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' driver-side mirror from Plaintiff and Class Members, Subaru concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

133.    Defendant knew that the Class Vehicles' driver-side mirrors suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

134.    Defendant was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles' driver-side mirrors and/or the associated repair costs because:

e.    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' driver-side mirrors;

f.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

g.      Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their driver-side mirrors have a dangerous safety defect until after they purchased the Class Vehicles; and,

h.      Defendant knew that Plaintiff and the Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

135.    On information and belief, Subaru still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Mirror Defect and the performance and quality of Class Vehicles.

136.    The facts concealed or not disclosed by Defendant to Plaintiff and Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

137.    Plaintiff and Class Members relied on Defendant to disclose material information it knew, such as the defective nature of the driver-side mirrors in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

138.    By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

139.    The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

140.    Plaintiff and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

141.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiff and Class Members.

142.    Defendant's intentional concealment of and failure to disclose the Mirror Defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff and Class Members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff and Class Members.

143.    Furthermore, Tex. Bus. & Com. Code § 17.50(a)(2) provides that a "consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (2) breach of an express or implied warranty."

144.    Defendant violated the DTPA by breaching its express and implied warranties. Defendant's breach of the express warranty and implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiff and Class Members.

145.    The Class Vehicles' Mirror Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road, because the Class Vehicles suffer from driver-side mirrors that vibrate, causing the reflection in the driver-side mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

146.    As a result of Defendant's acts, Plaintiff and Class Members have suffered damages in that they are left with vehicles of diminished value and utility because of the Mirror Defect, which continues to pose a serious safety risk.

147.    Moreover, Defendant's sale and lease of the defective Class Vehicles and failure to repair the Mirror Defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff and the Class, that conduct took advantage of Plaintiff and Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff and Class Members.

148.    Plaintiff and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect, which is the reasonable and objective consumer expectation for vehicles.

149.    As a result of Defendant's misconduct, Plaintiff and Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement, and are worth less money because of the Mirror Defect.

150.    Plaintiff has provided adequate notice to Defendant.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendant as follows:

a.    An order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b.    An order awarding Plaintiff and Class Members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c.    An order awarding Plaintiff and the Class restitution, disgorgement, or other equitable relief as the Court deems proper;

d.  Equitable relief including, but not limited to, replacement of the Class Vehicles with new vehicles, or repair of the defective Class Vehicles with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

e.  A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

f.  Reasonable attorneys' fees and costs;

g.  Pre-judgment and post-judgment interest, as provided by law;

h.  Plaintiff demands that Defendant perform a recall, and repair all Class Vehicles; and

i.  Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**


Dated: September 20, 2024

KATELYN ROBINSON, *ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED*,

By  /s/ *Sergei Lemberg*

Sergei Lemberg, Esq.
LEMBERG LAW, LLC
43 Danbury Road
Wilton, CT 06897
Phone: (203) 653-2250
Fax:    (203) 653-3424
*Attorneys for Plaintiff*