## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Katelyn Robinson, Michelle Anders, Michael Brenner, Ricardo Chaidez, Jessica Taylor, *on behalf of themselves and all others similarly situated*, | : <br> : <br> : <br> : Civil Action No.: 1:24-cv-09334-KMW-EAP <br> : <br> : **FIRST AMENDED CLASS ACTION** |
| Plaintiffs, <br> v. <br> Subaru of America, Inc., <br> Defendant. | : **COMPLAINT** <br> : <br> : **JURY TRIAL DEMANDED** <br> : <br> : <br> : <br> : |

Plaintiffs Katelyn Robinson, Michelle Anders, Michael Brenner, Ricardo Chaidez, and Jessica Taylor, by undersigned counsel, bring the following First Amended Class Action Complaint against Defendant Subaru of America, Inc. ("Defendant" or "Subaru"), and allege, on their own behalf and on behalf of all those similarly situated, as follows:

### INTRODUCTION

1.      Plaintiffs bring this lawsuit on behalf of themselves and a proposed class of past and present owners and lessees of defective 2024 Subaru Crosstrek, 2024 Subaru Ascent, and 2023-2024 Subaru Solterra vehicles  (collectively the "Class Vehicles") marketed, distributed, sold, warranted, and serviced by Defendant.

2.      Plaintiffs and the Class were damaged because the Class Vehicles contain defective side-view mirrors.

3.      Prior to selling the Class Vehicles to Plaintiff and class members, Defendant knew that the Class Vehicles contained a safety defect causing the side-view mirrors to shake and vibrate while the Class Vehicles are driven  (the "Mirror Defect" or the "Defect").  As a result of the Defect, the reflection of the road and of other vehicles in the side-view mirror is

distorted and drivers are unable to safely drive and observe traffic.  The Mirror Defect is a result of, *inter alia,* deficient materials used to make the mirror housing components themselves and/or a deficiency in the structure of the mirror housing and/or its components.

4.    The Mirror Defect poses an extreme safety hazard to drivers and other operators because a vibrating mirror distorts the reflection of vehicles and objects behind or alongside the vehicle, which makes it difficult for a driver to accurately judge distances or identify potential hazards, especially at night, increasing the risk of accidents during lane changes or turns.  The constant movement of a vibrating mirror distracts drivers, causing them to take their eyes off the road; this is dangerous because even a minor distraction can lead to delayed reactions and increased chances of collisions.  A vibrating mirror also fails to provide a clear image of the blind spots, which in turn poses danger to class members and other drivers when merging into traffic or changing lanes, as the driver may miss seeing vehicles or motorcycles in adjacent lanes. Additionally, mirror vibrations exacerbate glare from headlights at night, making it even harder to see objects clearly, further increasing the potential for errors in judgment.

5.    Moreover, the Mirror Defect makes the Class Vehicles non-compliant with Federal Motor Vehicle Safety Standard ("FMVSS") No. 111, issued by the National Highway Traffic Safety Administration ("NHTSA"), which sets specific requirements to ensure the driver's visibility of the road behind and to the sides of the vehicle and mandates side-view mirrors must provide a clear, undistorted view of the highway to the rear of the vehicle along the driver's and passenger sides, and mirrors must minimize glare from headlights of vehicles behind the driver at night, ensuring safe nighttime driving conditions.

6.    To date, Subaru has failed to correct the safety defect under Subaru's warranty, requiring that Class Vehicle owners continue to operate their vehicles with the safety defect.

Indeed, Subaru has not issued any adequate repairs to its dealers, has not issued a safety recall, and at most Subaru replaces defective mirrors with the same defective part which does not fix the issue:

- NHTSA Complaint No. 11601634 (2024 Subaru Ascent), July 12, 2024 (Incident Date January 25, 2024): Driver's side mirror demonstrates excessive shaking as compared to passenger side. Housing has been replaced but no change. Visually difficult for me to use that mirror at times.

7.      Further, the Mirror Defect often manifests immediately after Class Members take ownership of the vehicles and Class Vehicle owners, including the Plaintiff Robinson, have complained that they experienced the Mirror Defect within weeks of acquiring their vehicles:

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still [has not] been found. **The driver-side mirror has had this issue since the car was purchased.**

8.      Despite having pre-sale knowledge of the Defect, Subaru failed to disclose it to Plaintiffs and other class members at the time of purchase or lease.  Had it done so, Plaintiffs and class members would not have purchased the Class Vehicles or would have paid substantially less for them.

9.      Subaru's conduct is in violation of the Texas's Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.*, Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann. § 45.50.471, *et seq.*, California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.201, *et seq.*, Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et*

3

*seq*., and constitutes fraudulent concealment, unjust enrichment, and a breach of express and implied warranties.

10.    Subaru has and will continue to benefit from its unlawful conduct – by selling more vehicles, at a higher price, and avoiding warranty obligations – while consumers are harmed at the point of sale as their vehicles continue to suffer from the unremedied Mirror Defect.

11.    To remedy Subaru's unlawful conduct, Plaintiffs, on behalf of themselves and putative class members, seek damages and restitution from Subaru, as well as notification to class members about the defect.

**<u>PARTIES</u>**

12.    Plaintiff Katelyn Robinson ("Ms. Robinson") is an adult individual residing in New Braunfels, Texas.

13.    Plaintiff Michelle Anders ("Ms. Anders") is an adult individual residing in Palmer, Alaska.

14.    Plaintiff Michael Brenner ("Mr. Brenner") is an adult individual residing in Temecula, California.

15.    Plaintiff Ricardo Chaidez ("Mr. Chaidez") is an adult individual residing in Sandy, Utah.

16.    Plaintiff Jessica Taylor ("Ms. Taylor") is an adult individual residing in Pensacola, Florida.

17.    Defendant Subaru of America, Inc. ("Subaru" or "Defendant"), is a New Jersey business entity with a principal place of business at 2235 Marlton Pike West, Cherry Hill, New Jersey 08002.  The Defendant is in the business of marketing, supplying, and selling motor

4

vehicles accompanied by written warranties to the public at large through a system of authorized dealerships.

18.    At all times herein mentioned,  Defendant reviews and analyzes warranty data submitted by Defendant's dealerships and authorized technicians in order to identify defect trends in vehicles.  Upon information and belief,  Defendant dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendant decides to audit the dealership. Defendant uses this information to determine whether particular repairs are covered by an applicable Subaru warranty or are indicative of a pervasive defect.

19.    Defendant also developed the marketing materials to which Plaintiffs and the Class were exposed, owner's manuals, informational brochures, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Mirror Defect.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Class Members, and Defendant are citizens of different states.

21.    Personal jurisdiction and venue are proper in this District as Defendant is headquartered in this District.

## FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS

**A. Katelyn Robinson**

22.     On July 15, 2024, Ms. Robinson, a resident of Texas, purchased a new 2024 Subaru Crosstrek, Vehicle Identification Number JF2GUADC0RH378154 (hereafter the "Robinson Vehicle") from Gillman Subaru in Selma, Texas (hereafter "Gillman Subaru"), Defendant's authorized dealership.

23.     Ms. Robinson paid $30,027.00, plus taxes, fees, and other charges, for the Robinson Vehicle.

24.     Passenger safety and reliability were important factors to Ms. Robinson's decision to purchase the vehicle. Prior to purchasing the 2024 Subaru Crosstrek, Ms. Robinson researched the vehicle by visiting Gillman Subaru and reviewing Subaru Crosstrek specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles.

25.     In its *Monroney* Sticker, Subaru provides consumers with information describing the Subaru Crosstrek's suggested retail price, a list of equipment included in the base price, such as safety features, entertainment systems, and warranties, prices of factory-installed options or packages, fuel economy information, crash safety rating, where vehicle was manufacturer and country of origin of major components, and all with an intent to induce the consumer, including Ms. Robinson, into a vehicle purchase or lease transaction.

26.     Based on Subaru's representations on its *Monroney* sticker and based on its authorized dealership's representations, Ms. Robinson was led to believe that the 2024 Subaru Crosstrek was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced her to purchase the vehicle.

6

27.     Prior to the purchase, Gillman Subaru assured Ms. Robinson that the Robinson Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

28.     In its New Vehicle Limited Warranty Subaru promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

29.     Despite Ms. Robinson's research prior to purchasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of purchase that the 2024 Subaru Crosstrek contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Ms. Robinson was not aware of, and did not have any reason to anticipate, that her vehicle was afflicted by the Mirror Defect when she purchased the vehicle.

30.     Subaru's omissions were material to Ms. Robinson.  If Subaru had adequately disclosed these facts before Ms. Robinson purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle had she known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

31.     Soon after Ms. Robinson took delivery of the Robinson Vehicle, she observed the vehicle's diver-side mirror shook and vibrated while the driving at speed or on the highway, causing the reflection in the driver-side mirror to appear blurry and impeding her ability to observe traffic.

32.     On August 6, 2024, within a month of purchase and with the vehicle's odometer reading under 900 miles, Ms. Robinson returned her vehicle to Gillman Subaru and complained about the driver-side mirror shaking.

33.     Gillman Subaru inspected the Robinson Vehicle and placed a special order for a replacement driver-side mirror.

7

34.     On August 15, 2024, Ms. Robinson returned her vehicle to Gillman Subaru once she was informed the replacement part had arrived.

35.     During that visit, Gillman Subaru verified Ms. Robinson's diver-side mirror shaking complaint and replaced the driver-side mirror assembly.

36.     However, the repair attempt did not correct the Defect. Following the repair, the driver-side mirror continued to shake when driving at speed.

37.     On August 19, 2024, Ms. Robinson returned her vehicle to Gillman Subaru and complained again that the vehicle's driver-side mirror still shook while driving, causing the image in the driver-side mirror to become distorted and impeding her ability to observe traffic.

38.     Gillman Subaru responded there was nothing else it would do for Ms. Robinson and refused to undertake any further repairs.

39.     On September 12, 2024, Ms. Robinson, through her counsel, sent a letter to Subaru advising it that the Robinson Vehicle suffered from the Mirror Defect and that Ms. Robinson was denied a repair under Subaru's warranty.

40.     To date, the Robinson Vehicle remains unrepaired and its driver-side mirror continues to shake and vibrate when driving and is unrepaired, and impedes Ms. Robinson's ability to safely operate her vehicle.

**B.  Michelle Anders**

41.     On February 17, 2024, Ms. Anders, a resident of Alaska, purchased a new 2024 Subaru Ascent, Vehicle Identification Number 4S4WMAWD2R3413401 (hereafter the "Anders Vehicle") from Continental Motors Co. in Anchorage, Alaska (hereafter "Continental Subaru"), Defendant's authorized dealership.

42.     Ms. Anders paid $49,214.00, plus taxes, fees, and other charges, for the Anders Vehicle.

43.     Passenger safety and reliability were important factors to Ms. Anders' decision to purchase the vehicle. Prior to purchasing the 2024 Subaru Ascent, Ms. Anders researched the vehicle by looking at the vehicle's specifications and features on Subaru's website, and by visiting Continental Subaru and reviewing Subaru Ascent specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles.

44.     In its *Monroney* Sticker, Subaru provides consumers with information describing the Subaru Ascent's suggested retail price, a list of equipment included in the base price, such as safety features, entertainment systems, and warranties, prices of factory-installed options or packages, fuel economy information, crash safety rating, where vehicle was manufacturer and country of origin of major components, and all with an intent to induce the consumer, including Ms. Anders, into a vehicle purchase or lease transaction.

45.     Based on Subaru's representations on its website and on its *Monroney* sticker, and based on its authorized dealership's representations, Ms. Anders was led to believe that the 2024 Subaru Ascent was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced her to purchase the vehicle.

46.     Prior to the purchase, Continental Subaru assured Ms. Anders that the Anders Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

47.     In its New Vehicle Limited Warranty Subaru promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

48.     Despite Ms. Anders' research prior to purchasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of purchase that the 2024 Subaru Ascent contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Ms. Anders was not aware of, and did not have any reason to anticipate, that her vehicle was afflicted by the Mirror Defect when she purchased the vehicle.

49.     Subaru's omissions were material to Ms. Anders.  If Subaru had adequately disclosed these facts before Ms. Anders purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle had she known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

50.     Within a month Ms. Anders took delivery of the Anders Vehicle, she noticed the vehicle's diver-side mirror shook and vibrated while the driving at speed or on the highway, causing the reflection in the driver-side mirror to appear blurry and impeding her ability to observe traffic.

51.     On June 20, 2024, and with the vehicle's odometer reading under 5,253 miles, Ms. Anders returned her vehicle to Continental Subaru and complained the driver-side mirror shook violently when driving at speed and impaired her ability to observe traffic beside or behind her vehicle.

52.     Continental Subaru inspected the Anders Vehicle, verified her complaint, and placed a special order for a replacement mirror assembly.

53.     On July 12, 2024, Ms. Anders returned her vehicle to Continental Subaru once she was informed the replacement part had arrived.

54.     During that visit, Continental Subaru replaced the side mirror assembly.

55.     However, the repair attempt did not correct the Defect. As soon as Ms. Robinson left the dealership, she observed the driver-side mirror continued to shake when driving at speed just the same or even worse.  Ms. Anders immediately returned back to Continental Subaru and complained the Defect was not fixed.  In response, Continental Subaru asked Ms. Anders to make an appointment and return at a later date.

56.     On August 23, 2024, Ms. Anders returned her vehicle to Continental Subaru and complained again that the vehicle's driver-side mirror still shook while driving, causing the image in the driver-side mirror to become distorted and impeding her ability to observe traffic.

57.     Continental Subaru responded there was nothing else it would do for Ms. Anders, that Subaru would not authorize another side mirror assembly replacement, and refused to undertake any further repairs.

58.     On October 22, 2024, Ms. Anders, through her counsel, sent a letter to Subaru advising it that the Anders Vehicle suffered from the Mirror Defect and that Ms. Anders was denied a repair under Subaru's warranty.

59.     To date, the Anders Vehicle remains unrepaired and its driver-side mirror continues to shake and vibrate when driving and is unrepaired, and impedes Ms. Anders' ability to safely operate her vehicle.

**C.  Michael Brenner**

60.     On or about July 2, 2024, Mr. Brenner, a resident of California, leased a new 2024 Subaru Solterra, Vehicle Identification Number JTMABABA3RA060937 (hereafter the "Brenner Vehicle") from Hello Subaru of Temecula in Temecula, California (hereafter "Hello Subaru"), Defendant's authorized dealership.

61.     Passenger safety and reliability were important factors to Mr. Brenner's decision to lease the vehicle. Prior to leasing the 2024 Subaru Solterra, Mr. Brenner researched the vehicle by looking at the vehicle's specifications and features on Subaru's website, and by visiting Hello Subaru and reviewing Subaru Solterra specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles.

62.     In its *Monroney* Sticker, Subaru provides consumers with information describing the Subaru Solterra's suggested retail price, a list of equipment included in the base price, such as safety features, entertainment systems, and warranties, prices of factory-installed options or packages, fuel economy information, crash safety rating, where vehicle was manufacturer and country of origin of major components, and all with an intent to induce the consumer, including Mr. Brener, into a vehicle purchase or lease transaction.

63.     Based on Subaru's representations on its website and on its *Monroney* sticker, and based on its authorized dealership's representations, Mr. Brenner was led to believe that the 2024 Subaru Solterra was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced him to lease the vehicle.

64.     Prior to the lease contract signing, Hello Subaru assured Mr. Brenner that the Brenner Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

65.     In its New Vehicle Limited Warranty Subaru promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

66.     Despite Mr. Brenner's research prior to leasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of lease that the 2024 Subaru Solterra contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Mr. Brenner was

not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Mirror Defect when he leased the vehicle.

67.     Subaru's omissions were material to Mr. Brenner.  If Subaru had adequately disclosed these facts before Mr. Brenner leased the vehicle, he would have learned of the concealed information and would not have leased the vehicle had he known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

68.     Soon after Mr. Brenner took delivery of the Brenner Vehicle, he noticed the vehicle's diver-side mirror shook and vibrated while the driving at speed or on the highway, causing the reflection in the driver-side mirror to appear blurry and impeding his ability to observe traffic.

69.     On September 9, 2024, and with the vehicle's odometer reading under 2,229 miles, Mr. Brenner returned his vehicle to Hello Subaru and complained the driver-side mirror shook when driving at speed or on bumpy roads and impaired his ability to observe traffic beside or behind his vehicle.

70.     Hello Subaru inspected the Brenner Vehicle and confirmed the mirror has a vibration. However, Hello Subaru told Mr. Brenner there was nothing it would do for him as such vibration was considered "normal," and refused to undertake any repair.

71.     On October 7, 2024, Mr. Brenner, through his counsel, sent a letter to Subaru advising it that the Brenner Vehicle suffered from the Mirror Defect and that Mr. Brenner was denied a repair under Subaru's warranty.

72.     To date, the Brenner Vehicle remains unrepaired and its driver-side mirror continues to shake and vibrate when driving and is unrepaired, and impedes Mr. Brenner's ability to safely operate his vehicle.

**D. Ricardo Chaidez**

73.    On January 11, 2024, Mr. Chaidez, a resident of Utah, purchased a new 2024 Subaru Crosstrek, Vehicle Identification Number 4S4GUHT67R3753033 (hereafter the "Chaidez Vehicle") from Mark Miller Subaru South Towne in Sandy, Utah (hereafter "Mark Miller Subaru"), Defendant's authorized dealership.

74.    Mr. Chaidez paid $33,516.00, plus taxes, fees, and other charges, for the Chaidez Vehicle.

75.    Passenger safety and reliability were important factors to Mr. Chaidez' decision to purchase the vehicle. Prior to purchasing the 2024 Subaru Crosstrek, Mr. Chaidez researched the vehicle by looking at the vehicle's specifications and features on Subaru's website, and by visiting Mark Miller Subaru and reviewing Subaru Crosstrek specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles.

76.    In its *Monroney* Sticker, Subaru provides consumers with information describing the Subaru Crosstrek's suggested retail price, a list of equipment included in the base price, such as safety features, entertainment systems, and warranties, prices of factory-installed options or packages, fuel economy information, crash safety rating, where vehicle was manufacturer and country of origin of major components, and all with an intent to induce the consumer, including Mr. Chaidez, into a vehicle purchase or lease transaction.

77.    Based on Subaru's representations on its website and on its *Monroney* sticker, and based on its authorized dealership's representations, Mr. Chaidez was led to believe that the 2024 Subaru Crosstrek was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced him to purchase the vehicle.

78.     Prior to the purchase, Mark Miller Subaru assured Mr. Chaidez that the Chaidez Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

79.     In its New Vehicle Limited Warranty Subaru promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

80.     Despite Mr. Chaidez' research prior to purchasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of purchase that the 2024 Subaru Crosstrek contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Mr. Chaidez was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Mirror Defect when he purchased the vehicle.

81.     Subaru's omissions were material to Mr. Chaidez.  If Subaru had adequately disclosed these facts before Mr. Chaidez purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle had he known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

82.     Few months after Mr. Chaidez took delivery of the Chaidez Vehicle, he took the vehicle for a road trip on the highway and noticed the vehicle's diver-side mirror shook and vibrated while driving at highway speeds, causing the reflection in the driver-side mirror to appear blurry and impeding his ability to observe traffic, especially during nigh-time driving.

83.     On June 28, 2024, and with the vehicle's odometer reading under 5,089 miles, Mr. Chaidez returned his vehicle to Mark Miller Subaru and complained the driver-side mirror rattled when driving at highway speeds and impaired his ability to observe traffic.

84.     Mark Miller Subaru inspected the Chaidez Vehicle and told Mr. Chaidez there was nothing it would do for him as his mirror was "operating as designed" and refused to undertake any repair.

85.     On October 22, 2024, Mr. Chaidez, through his counsel, sent a letter to Subaru advising it that the Chaidez Vehicle suffered from the Mirror Defect and that Mr. Chaidez was denied a repair under Subaru's warranty.

86.     To date, the Chaidez Vehicle remains unrepaired and its driver-side mirror continues to shake and vibrate when driving and is unrepaired, and impedes Mr. Chaidez' ability to safely operate his vehicle.

**E.  Jessica Taylor**

87.     In December 2023, Ms. Taylor, a resident of Florida, purchased a new 2024 Subaru Crosstrek, Vehicle Identification Number 4S4GUHF65R3741006 (hereafter the "Taylor Vehicle") from Anderson Subaru in Pensacola, Florida (hereafter "Pensacola Subaru"), Defendant's authorized dealership.

88.     Passenger safety and reliability were important factors to Ms. Taylor's decision to purchase the vehicle. Prior to purchasing the 2024 Subaru Crosstrek, Ms. Taylor researched the vehicle by looking at the vehicle's specifications and features on Subaru's website, and by visiting Pensacola Subaru and reviewing Subaru Crosstrek specifications and features listed on Subaru's *Monroney* sticker affixed to such vehicles.

89.     In its *Monroney* Sticker, Subaru provides consumers with information describing the Subaru Crosstrek's suggested retail price, a list of equipment included in the base price, such as safety features, entertainment systems, and warranties, prices of factory-installed options or packages, fuel economy information, crash safety rating, where vehicle was manufacturer and

country of origin of major components, and all with an intent to induce the consumer, including Ms. Taylor, into a vehicle purchase or lease transaction.

90.     Based on Subaru's representations on its website and on its *Monroney* sticker, and based on its authorized dealership's representations, Ms. Taylor was led to believe that the 2024 Subaru Crosstrek was, among other things, a safe, reliable, and high-quality vehicle, and Subaru's representations induced her to purchase the vehicle.

91.     Prior to the purchase, Pensacola Subaru assured Ms. Taylor that the Taylor Vehicle was accompanied by Subaru's New Vehicle Limited Warranty.

92.     In its New Vehicle Limited Warranty Subaru promised to "correct defects in material or workmanship" without charge within 36 months or 36,000 miles in service, whichever occurs first.

93.     Despite Ms. Taylor's research prior to purchasing the vehicle, neither Subaru nor the selling dealership ever disclosed at the time of purchase that the 2024 Subaru Crosstrek contained the Mirror Defect. Indeed, Subaru concealed this information from consumers, and Ms. Taylor was not aware of, and did not have any reason to anticipate, that her vehicle was afflicted by the Mirror Defect when she purchased the vehicle.

94.     Subaru's omissions were material to Ms. Taylor.  If Subaru had adequately disclosed these facts before Ms. Taylor purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle had she known the vehicle suffered from the Mirror Defect, or would have paid substantially less for it.

95.     After Ms. Taylor took delivery of the Taylor Vehicle, she noticed the vehicle's diver-side mirror and passenger-side mirror shook and vibrated while the driving at speed or on

the highway, causing the reflection in the side-view mirrors to appear blurry and impeding her ability to observe traffic.

96.     On November 1, 2024, and with the vehicle's odometer reading about 9,000 miles, Ms. Taylor returned her vehicle to Pensacola Subaru and complained the diver-side mirror and passenger-side mirror shook when driving at speed and impaired her ability to observe traffic behind her vehicle.

97.     Pensacola Subaru inspected the Taylor Vehicle, verified her complaint, but responded there was no repair Subaru could offer for this issue.

98.     On November 19, 2024, Ms. Taylor, through her counsel, sent a letter to Subaru advising it that the Taylor Vehicle suffered from the Mirror Defect and that Ms. Taylor was denied a repair under Subaru's warranty.

99.     To date, the Taylor Vehicle remains unrepaired and its side-view mirrors continue to shake and vibrate when driving and are unrepaired, and impede Ms. Taylor's ability to safely operate her vehicle.

## FACTUAL ALLEGATIONS APPLICABLE TO PLAINTIFF AND THE CLASS

### I.    The Mirror Defect

100.    The Subaru Crosstrek is a small crossover vehicle that was completely redesigned for the 2024 model year.

101.    The Subaru Ascent is a midsize three-row crossover vehicle. Subaru redesigned its side mirror assembly for the 2024 model year.

102.    The Subaru Solterra is an all-electric SUV first released for sale in the United States as the 2023 model year vehicle.

18

103.    The 2024 Subaru Crosstrek and 2024 Subaru Ascent vehicles' side-view mirror assemblies share many of the same internal components including the same driver-side and passenger-side mirror glass, and the same tapping screws used to secure various components in the side-view mirror assembly.

104.    Subaru has sold tens of thousands of 2024 Subaru Crosstrek, 2024 Subaru Ascent, and 2023-2024 Subaru Solterra Class Vehicles across the United States and in Texas, Alaska, California, Utah, and Florida.

105.    Subaru has affirmatively represented that its Class Vehicles are safe and tough.[1] For example, on its website Subaru touts that the 2024 Crosstrek is "completely redesigned," with "upgraded cutting-edge technology, enhanced safety, and more rugged style."[2]

106.    Likewise, on its website Subaru touts the 2024 Ascent and 2024 Solterra as a safe and dependable vehicle.[3]

107.    The Class Vehicles suffer from the Mirror Defect.  Specifically, as a result of the way the vehicles' mirror housings are manufactured and/or made and the use of deficient materials, the Class Vehicles' side-view mirror mounting points are not sufficiently strong and rigid for normal driving conditions and their intended use, and as a result the side-view mirrors shake and vibrate when driving under normal conditions.

108.    As set forth in the consumer complaints below, both Crosstrek, Ascent, and Solterra owners report the glass within the mirror assembly shakes and vibrates while driving.

---

[1] https://www.subaru.com/vehicles/crosstrek.html (last visited September 19, 2024).
[2] https://www.subaru.com/vehicles/crosstrek/features.html (last visited September 19, 2024).
[3] https://www.subaru.com/vehicles/ascent/features.html (last visited September 19, 2024); https://www.subaru.com/vehicles/solterra.html (last visited December 13, 2024).

109.    The Mirror Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on rearward visibility.

110.    Specifically, the Defect poses an extreme safety hazard to drivers and other operators because a vibrating mirror distorts the reflection of vehicles or objects behind or alongside the car, which makes it difficult for a driver to accurately judge distances or identify potential hazards, especially at night, increasing the risk of accidents during lane changes or turns.  The constant movement of a vibrating mirror distracts the driver, causing them to take their eyes off the road, and even a minor distraction can lead to delayed reactions and increased chances of collisions. A vibrating mirror fails to provide a clear image of blind spots, which in turn poses danger when merging into traffic or changing lanes, as the driver may miss seeing vehicles or motorcycles in adjacent lanes.  Furthermore, mirror vibrations exacerbate glare from headlights at night, making it even harder to see objects clearly, increasing the potential for errors in judgment.

111.    Moreover, the Mirror Defect makes the Class Vehicles non-compliant with Federal Motor Vehicle Safety Standard No. 111, issued by the National Highway Traffic Safety Administration, which sets specific requirements to ensure the driver's visibility of the road behind and to the sides of the vehicle and mandates that side-view mirrors must provide a clear, undistorted view of the highway to the rear of the vehicle, and mirrors must minimize glare from headlights of vehicles behind the driver at night, ensuring safe nighttime driving conditions.

112.    Further,  Subaru refuses to repair the Mirror Defect under its written warranty when given a reasonable opportunity to do so, or replaces defective side-view mirror assembly with the same defective parts that fail to cure the Defect.

113.    Subaru has long known that its side-view mirrors will vibrate due to defective mounting.  For instance in December 2015 it issued Technical Service Bulletin, No. 12-195-15, which addressed complaints about " vibration or looseness in either of the door mirrors" because mirrors were insufficiently secured to the vehicles.

114.    However, Subaru has not issued any bulletins or instructions to its dealerships regarding the Class Vehicles' defective side-view mirrors or repairing the same.

115.    The Mirror Defect can and often does manifest immediately after Class Members take ownership of the vehicles and Class Vehicle owners, including the Plaintiff Robinson, have complained that they experienced the Mirror Defect within weeks of acquiring their vehicles:

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still [has not] been found. **The driver-side mirror has had this issue since the car was purchased.**

116.    Furthermore, when side-view mirror repairs are performed by Defendant's dealers, defective mirrors are merely replaced with other defective mirrors:

- NHTSA Complaint No. 11601634 (2024 Subaru Ascent), July 12, 2024 (Incident Date January 25, 2024): Driver's side mirror demonstrates excessive shaking as compared to passenger side. **Housing has been replaced but no change.** Visually difficult for me to use that mirror at times.

117.    Subaru had and has a duty to fully disclose the true nature of the Mirror Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Subaru had and has exclusive knowledge or access to material facts about the Class Vehicles' side-view mirrors that were and are not known to or

reasonably discoverable by Plaintiffs and the other Class Members; and because Subaru has actively concealed the Mirror Defect from its customers.

## II.     Subaru's Knowledge of the Defect

118.     Before Subaru sold and leased Plaintiffs their Class Vehicle, Subaru was on notice that the Class Vehicles suffered from the Mirror Defect, however Subaru failed to disclose the existence of the defect to Plaintiffs or any other Class Vehicle owner.

119.     Subaru became aware of the Mirror Defect through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Subaru's network of dealers and directly to Subaru, aggregate warranty data compiled from Subaru's network of dealers, testing conducted by Subaru in response to consumer complaints, and repair order and parts data received by Subaru from Subaru's network of dealers.

120.     On information and belief, during the pre-release process of designing, manufacturing, engineering, and performing durability testing on the Class Vehicles, which would have likely occurred early 2022 and Spring 2023 before Subaru began selling the Class Vehicles in 2023 (Solterra in June 2022, Crosstrek in Spring 2023, Ascent in Fall 2023), Subaru necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' side-view mirrors: the types and properties of materials used to make them, including their durability and whether those materials were sufficiently sturdy and rigid to prevent side-view mirrors from shaking and vibrating when driving; the basic engineering principles behind their construction; the forces and stresses the side-view mirrors would face; when and how the

side-view mirrors would fail; and the cumulative and specific impacts on the side-view mirrors caused by wear and use, the passage of time, and environmental factors.

121.    An adequate pre-release analysis of the design, engineering, and manufacture of the side-view mirrors used for the Class Vehicles would have revealed to Subaru that as a result of the manner in which the side-view mirrors were made, assembled, and mounted, and the materials used, the side-view mirrors were insufficiently sturdy and rigid for the intended use. Thus, during the pre-release analysis stage of the Class Vehicles, Subaru would have known that the side-view mirrors installed in Class Vehicles were defective, would shake and vibrate when driving, and would pose a safety risk to owners/lessees and the motoring public. Despite that such testing on the Class Vehicles revealed the Mirror Defect to Subaru, Subaru failed to remedy the manufacturing processes with the Class Vehicles before putting the vehicles into production and selling them to the public.

122.    Subaru also learned about the Mirror Defect because of the higher-than-expected number of replacement side-view mirrors ordered from Subaru, which alerted Subaru that the mirrors are defective. Subaru service centers use Subaru replacement parts that they order directly from Subaru. Therefore, Subaru has detailed and accurate data regarding the number and frequency of replacement part orders, including replacement side-view mirrors. The ongoing sales of replacement side-view mirrors and the fact that side-view mirrors were being ordered at such high rates (and at rates higher than side-view mirrors for other Subaru vehicles), was known to Subaru and would have alerted Subaru that its side-view mirrors were defective and posed a safety risk early on.

123.    Subaru also knew about the Mirror Defect because numerous consumer complaints regarding side-view mirrors shaking and vibrating were made directly Subaru and its

dealerships. The large number of complaints, and the consistency of their descriptions of side-view mirrors shaking and vibrating alerted Subaru to this serious Defect affecting the Class Vehicles. The full universe of complaints made directly to Subaru about the Mirror Defect is information presently in the exclusive custody and control of Subaru and is not yet available to Plaintiffs prior to discovery. However, upon information and belief, many Class Vehicle owners, including the Plaintiffs, complained directly to Subaru and Subaru dealerships and service centers about the ongoing shaking and vibration of side-view mirrors in their vehicles.

124.    Because the Mirror Defect can and does manifest almost immediately – often within weeks of the Class Vehicles first being driven – Subaru began receiving notification of the higher-than-expected number of replacement side-view mirrors ordered from Subaru and consumer complaints regarding side-view mirrors failure within weeks after Subaru began selling the Class Vehicles mid-2022 (Solterra in June 2022, Crosstrek in Spring 2023 and Ascent in Fall 2023).

III.    **The NHTSA Complaints and Online Discussions of the Defect**

125.    Upon information and belief, thousands of purchasers and lessees of the Class Vehicles have experienced the Mirror Defect. Given how widespread the issue is and the fact that Mirror Defect manifests within weeks of the Class Vehicles sale, Class Vehicle owners have been complaining about the Mirror Defect directly to Subaru since 2023 and have been posting such complaints online since at least Spring 2023.

126.    Automobile manufacturer and distributors, including Subaru, regularly monitor social media for vehicle owners concerns. Upon information and belief, Subaru maintains

presence on and regularly monitors social media for such content too, has done so since it began

selling the Class Vehicles, and published social media user guidelines on its website.[4]

127.    Through its monitoring of social media, Subaru learned about the Defect.

128.    For instance on www.solterraforum.com, a Subaru Solterra vehicle enthusiast

website that upon information and belief Subaru regularly monitors, in a May 15, 2023, post a

Class Vehicle owner complained "at highway speeds the driver side rear view mirror starting

fluttering or vibrating due to the wind pressure" and "made it difficult to get a view out of that

mirror."[5] Several other Class Vehicle owners responded, and posted on the same forum, that they

had near-identical experiences.[6]

129.    On Reddit, seven more Solterra Class Vehicle owners also complained driver-side

mirrors shook and vibrated in their cars.[7]

130.    Likewise, on www.subaruxvforum.com, a Subaru Crosstrek vehicle enthusiast

website that upon information and belief Subaru regularly monitors, a November 5, 2023 post

written by a Class Vehicle owner complained of "the glass of the driver side mirror vibrating at

highway speed or uneven pavement," that it is the glass within the mirror assembly, and not the

assembly itself, that vibrates, and a replacement driver-side mirror assembly has not resolved the

---

[4] https://www.subaru.com/support/privacy-policies.html (last visited September 19, 2024).
[5] https://www.solterraforum.com/threads/fluttering-vibrating-rear-view-mirror.1298/ (last visited December 13, 2024).
[6] *Id*.; *see also* https://www.solterraforum.com/threads/rear-view-mirrors.2199/
 (last visited December 13, 2024).
[7]
https://www.reddit.com/r/Solterra/comments/1g81v4s/anyone_run_into_mirror_issues/?rdt=597 25 (last visited December 13, 2024).

problem.[8]  Fourteen other Class Vehicle owners responded that they had near-identical experiences.

131.    On Reddit, Crosstrek Class Vehicle owners also shared that they had near-identical experiences; one owner complained in September 2023 that he "noticed a lot of shaking in the glass itself on the driver side mirror. [he] took it into [his] dealership […] to get it fixed but they told me that it was normal and by design which baffles [him] since it doesn't do it on the right side."[9]  In response, other Class Vehicle owners complained experiencing the same Defect, and receiving a replacement driver-side mirror, but "[n]ew driver's side mirror vibrates just as bad."[10]  In another Reddit thread, Class Vehicle Owners likewise share their complaints about driver-side mirrors shaking and that replacement mirror did not resolve the Defect.[11]

132.    Similarly, many Ascent Class Vehicles owners expressed their frustration on Reddit; one owner shared in May 2024 how in her "Ascent with less than 1000 miles […] driver side rearview mirror shakes considerably which makes it distracting when driving on the highway," but dealer offered no repair claiming such was "normal."[12]

---

[8] https://www.subaruxvforum.com/threads/driver-side-mirror-glass-vibration.187158 (last visited September 19, 2024).

[9] https://www.reddit.com/r/Crosstrek/comments/17fm7f9/anyone_elses_driver_side_mirror_shaking_in_their/?rdt=36691 (last visited September 19, 2024).

[10] *Id.*

[11] https://www.reddit.com/r/Crosstrek/comments/14sp2hk/comment/jr8wyli/?utm_source=share&utm_medium=ios_app&utm_name=ioscss&utm_content=1&utm_term=1&context=3 (last visited September 19, 2024). *See also* https://www.reddit.com/r/Crosstrek/comments/15rym1w/driver_side_mirror_shakes_at_high_speeds/ (last visited September 19, 2024); *see also* https://www.reddit.com/r/Crosstrek/comments/1asv7v2/driver_side_mirror_shaking_blurry_vibrating_on/ (last visited September 19, 2024).

[12] https://www.reddit.com/r/SubaruAscent/comments/1d1qxzs/driverside_rearview_mirror_shakes/ (last visited September 19, 2024).

133.    Likewise, Ascent Class Vehicles owners voiced their frustration about the Defect on the Ascent enthusiast forums.[13]  For example, one Ascent owner wrote she "[t]ook [car] into service today and they confirmed the vibration/shaking," "[t]hey replaced the entire mirror housing," but "as soon as [she] get on the road [she] notice it is actually worse now making the mirror almost unusable at highway speeds." Same owner said "[t]he mirror housing appears to be fine, but the glass is what is really loose and vibrates like crazy."[14]

134.    Similarly, on Facebook, Class Vehicle owners have been complaining about the Mirror Defect, since Subaru began selling the vehicles.  For instance, on April 29, 2024, one Ascent Class Vehicle owner published a post stating, "'24 Ascent with vibration in the driver side mirror that increases with speed. Minimal complaint, but a brand new car shouldn't have this issue. Subaru dealer replaced the glass and housing but the vibration remains."[15]  In response to original poster's question whether other owners experienced the same issue, several other Class Vehicle owners reported they did and replacement mirror did not resolve the problem.

135.    Moreover, Subaru monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA"). Federal law requires automakers like Subaru to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

---

[13] https://www.ascentforums.com/threads/driver-side-mirror-vibration-how-to-fix.21549/ (last visited September 19, 2024).
[14] *Id*.
[15] https://www.facebook.com/share/p/u6nW5NB9Xz9mhYZc/ (last visited September 19, 2024).

136.    Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Reporting Requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*.  Thus, Subaru knew or should have known of the many complaints about the Mirror Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Subaru to the Mirror Defect.

137.    The below example complaints concerning 2024 Subaru Crosstrek and 2024 Subaru Ascent vehicles, filed by consumers with the NHTSA and posted on the Internet, which on information and belief Subaru actively monitored during the relevant time period, demonstrate that the Defect is widespread and dangerous, and that Subaru has known about the defect at all relevant times:

- NHTSA Complaint No. 11585962 (2024 Subaru Ascent), April 29, 2024 (Incident Date April 12, 2024): Driver side mirror has vibration that increases with speed. At highway speeds, it is difficult to safely see the lane next to you, especially if there is a vehicle behind you with their headlights on. The vehicle's mirror glass and housing were replaced and the vibration remains. There is no observable vibration with the passenger side mirror. Was advised by a local dealership that there is no more they can do to eliminate the vibration.

- NHTSA Complaint No. 11593853 (2024 Subaru Crosstrek), June 12, 2024 (Incident Date May 6, 2024): Driver's Outside mirror shaking at highway speeds. Massive blur, headlights "dance" around, quite distracting and disorienting when checking for safe lane changes. Took brand new (less than 400 mile) 2024 Crosstrek Limited into local dealer to report buzzy left mirror. They took a look at it. Received this report: (Tech) said the mirror glass itself does shake but that is going to be normal because of how the mirror glass sits in the housing...according to our tech the vehicle is operating as designed I'm sorry, there's no way that a mirror should be shaking like that. The inside rearview mirror is pristine. The passenger side doesn't shake. It's the driver's mirror and now two Subaru employees have confirmed some shake, but won't do anything about it. This is a safety issue. It's starting to get traction on Reddit. [XXX] To avoid headaches, I

28

have to tilt the mirror down to keep dancing lights from affecting my vision. This is a safety issue that needs to be addressed. I was hoping that it would happen at a local dealer lever, but apparently, it might take submitting to the NHTSA. It's a great car, just has this particular issue.

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), June 18, 2024 (Incident Date June 1, 2024): The driver-side mirror vibrates and shakes excessively on rough roads or at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and replaced the mirror but was unable to fix it, stating that nothing else can be done. The driver-side mirror has had this issue since the car was delivered from the dealer.

- NHTSA Complaint No. 11598382 (2024 Subaru Ascent), July 2, 2024 (Incident Date March 9, 2024): The driver-side mirror vibrates and shakes excessively at highway speeds, making it difficult to use, especially at night. In contrast, the passenger-side mirror is stable at all speeds with minimal to no shaking. The dealer's service department confirmed the problem and worked on finding a solution. Solution still ha snot been found. The driver-side mirror has had this issue since the car was purchased.

- NHTSA Complaint No. 11599869 (2024 Subaru Crosstrek), July 7, 2024 (Incident Date June 29, 2024): In speeds above 50 mph, the drivers side mirror shakes and vibrates. This causes the picture to be extremely blurry, and makes it hard to discern other cars. I believe it to be a very real visibility issue for highway driving.

- NHTSA Complaint No. 11601634 (2024 Subaru Ascent), July 12, 2024 (Incident Date January 25, 2024): Driver's side mirror demonstrates excessive shaking as compared to passenger side. Housing has been replaced but no change. Visually difficult for me to use that mirror at times.

- NHTSA Complaint No. 11601636 (2024 Subaru Ascent), July 12, 2024 (Incident Date June 16, 2024): In my new 2024 Ascent, there's a vibration in the driver side mirror that gets worse as speed increases. It's a minor issue, but it's disappointing for a brand new car to have this problem. The Subaru dealer hasn't taken any action despite being informed about it, and the vibration persists.

- NHTSA Complaint No. 11606122 (2024 Subaru Ascent), August 2, 2024 (Incident Date March 30, 2024): Driver side mirror vibration, per dealer and manufacturer, this is a known issue with no fix released yet.

- NHTSA Complaint No. 11614573 (2024 Subaru Ascent), September 14, 2024 (Incident Date March 18, 2024): Driver side mirror glass shakes constantly at any speed. This has been reported to the only dealership around my area. Mirror was replaced once by Service Dept, but only the mirror housing (not the glass). The mirror shakes the same or worse now. I went back to the dealership within minutes of driving my car off the lot after the replacement and told them the issue was not fixed. I was told to reschedule. I took another day off work to bring the car back to them, only to be told there is nothing else they can do. They keep saying the passenger side mirror shakes too, but it doesn't- at all. I keep telling them this. This mirror issue presents a huge safety hazard, as it is unreliable and useless to use it. It is also a significant distraction while driving. There were no warnings on the car about this mirror issue. The issue began within a month of purchasing the vehicle in February 2024.

- NHTSA Complaint No. 11614732 (2024 Subaru Ascent), September 15, 2024 (Incident Date September 15, 2024): The driver's side mirror vibrates excessively, especially at highway speeds, to the point where it makes me nauseous to use it. I've asked my dealer to look at it, and I've even upgraded to the night-dimming mirrors, but the vibration still occurs. I am not comfortable using this mirror while driving. I am the original owner, and primary driver, of this vehicle, and it has had this problem since I bought it in April 2024. The car now has more than 14,000 miles on it, and the vibration is starting to affect my driving habits. I'm not using this mirror the way I would under normal circumstances, and it's just a matter of time until I miss someone in my blind spot due to this issue. Please encourage Subaru to address this problem. Other Ascent owners have complained about this, so I know it is not just an issue with my particular vehicle. Thank you!

- NHTSA Complaint No. 11614675 (2024 Subaru Ascent), September 15, 2024 (Incident Date April 1, 2024): The Driver's Door Mirror, has excessive shaking. Bought it to the Subaru dealer where it was purchased, they tried to replace it and the mirror was still shaking. Shop Manager informed me her notified SOA, no fix at this time. Was informed because of slight change to body style and mirror size it has this issue on the 2024 models. It causes the inability to use the mirror clearly on that side of the vehicle. It causes a bit of dizziness for me trying to decipher what I'm looking at. It is a useless but important item on the car for driving. There was no invoice given for the first date of service on 4/01/2024.

- NHTSA Complaint No. 11614927 (2024 Subaru Ascent), September 16, 2024 (Incident Date August 21, 2024): The driver side mirror vibrates making it unusable to use. Subaru is unable to repair the problem.

- NHTSA Complaint No. 11615028 (2024 Subaru Ascent), September 17, 2024 (Incident Date September 16, 2024): The driver side mirror vibration increases with the speed to a point that it affects the ability to see anything in the mirror.

- NHTSA Complaint No. 11615514 (2024 Subaru Ascent), September 19, 2024 (Incident Date September 16, 2024): Driver side mirrors shakes badly when speed is over 45 MHP. Many similar issues reported online forum.

- NHTSA Complaint No. 11616605 (2024 Subaru Ascent), September 26, 2024 (Incident Date April 30, 2024): The driver side mirror vibrates, causing the reflection in the driver-side mirror to become distorted and impeding the driver's ability to observe traffic. My understanding is that there is no remedy. The vehicle has done this since taking delivery in April 2024.

- NHTSA Complaint No. 11616604 (2024 Subaru Ascent), September 26, 2024 (Incident Date September 13, 2024): Driver side mirror shakes whe driving. It's difficult to see with it.

- NHTSA Complaint No. 11616866 (2024 Subaru Crosstrek), September 27, 2024 (Incident Date September 26, 2024): Driver side exterior mirror vibrates and blurs / distorts the visibility at higher speeds when on the freeway or interstate. This is on a brand new 2024 Subaru Crosstrek purchased less than a month ago. Dealer recreated the issue but will not fix because they said other new crosstreks do this as well and is a design flaw issue that does not have a repair???

- NHTSA Complaint No. 11616778 (2024 Subaru Ascent), September 27, 2024 (Incident Date June 30, 2024): Driver's side mirror shakes/vibrates at highway speeds and going over small bumps. It makes it difficult to look at while driving.

- NHTSA Complaint No. 11616995 (2024 Subaru Ascent), September 28, 2024 (Incident Date January 31, 2024): The driver's side mirror glass has excessive play which causes the mirror to vibrate when under power. The vibration has been present since the vehicle was new and has become incrementally worst. This significantly impacts the ability to clearly see using this mirror. Concern was brought to dealer who stated others vehicles on the lot so the same thing so there is no repair option available.

- NHTSA Complaint No. 11617572 (2024 Subaru Ascent), October 1, 2024 (Incident Date February 14, 2024): Driver side mirror shakes while driving.

- NHTSA Complaint No. 11620864 (2024 Subaru Ascent), October 20, 2024 (Incident Date March 24, 2024): Driver's side mirror vibrates at highway speeds

55+ mph, so much so that images in the mirror are blurry and difficult to clearly make out distance and speed of other vehicles. Vehicle has not been in for service, but is scheduled at the end of October for the 6K mile service. I'll report it then and see what the dealer says. I've seen that this is reported by other owners without resolution, and now there is also a class action lawsuit filed in TX.

- NHTSA Complaint No. 11621623 (2024 Subaru Crosstrek), October 23, 2024 (Incident Date September 27, 2024):  have noticed an issue with Driver side mirror housing, vibrates, and shakes while driving at any speed since I took delivery on September 27, 2024 from Subaru Of Clear Lake. It is making it hard to observe anything in that mirror, making it almost useless. Took it to Team Gilman Subaru north. They said that they tighten the mirror/ housing and that are confident that it is secure, but once I pull off lot it is still doing it! But I also was told that they would get me out quick and not have to do anything paperwork makes me wonder.

- NHTSA Complaint No. 11623844 (2024 Subaru Ascent), November 6, 2024 (Incident Date October 1, 2024): Noted the driver side mirror produces a shimmying image (glass appears to vibrate) at highway speeds and when going over bumps in road at lower speeds. This produces an unsafe vision of items out of the drivers side view mirror. Subaru replaced the glass and it actually got worse. So Subaru replaced the mirror housing on the driver side however the vibrating images are still there. Passenger side view mirror is unaffected. This creates a hazard as the view in the drivers side view mirror is distorted.

- NHTSA Complaint No. 11626138 (2024 Subaru Ascent), November 19, 2024 (Incident Date June 21, 2024): Driver side mirror shakes so much while driving that it is totally unsafe. Rear view and passenger side mirrors are fine. No vibrations. I have had this problem from day one.

- NHTSA Complaint No. 11628146 (2024 Subaru Ascent), December 1, 2024 (Incident Date October 25, 2024): When driving the side mirror on the driver's side vibrates so much that it impairs the drivers ability to see anything in it. I have had the mirror replaced once and the replacement does the same thing. I was told by the dealership that it is a known issue without a solution.

138.    By contrast, NHTSA shows only three complaint of mirror shaking in 2024 Subaru vehicles other than Crosstrek and Ascent, and three complaints total of mirror shaking in 2023 Subaru vehicles. Thus the volume and frequency of such complaints for the Class Vehicles,

especially when compared to other Subaru vehicles, alerted Subaru that the Class Vehicles suffered from defective side-view mirrors.

139.    Although Subaru was aware of the widespread nature of the Mirror Defect in the Class Vehicles, and that it posed grave safety risks, Subaru has failed to take adequate steps to notify all Class Vehicle owners of the Defect and provide relief.

140.    Customers have reported the Mirror Defect in the Class Vehicles to Subaru directly and through its dealers.  Defendant is fully aware of the Mirror Defect contained in the Class Vehicles.  Moreover, Defendant had the ability to notify Class Vehicle owners about the Mirror Defect directly and via its authorized dealerships at the time of sale and thereafter. Nevertheless, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendant:

    a.   failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Mirror Defect;

    b.   failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their side-view mirrors were not in good working order, were defective, and were not fit for their intended purpose; and,

    c.   failed to disclose and/or actively concealed the fact that the Class Vehicles and their side-view mirrors were defective, despite the fact that Defendant learned of the Mirror Defect as early as 2022.

141.    Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to take other remedial measures related to the Mirror Defect contained in the Class Vehicles.

142.    Defendant has not recalled the Class Vehicles to repair the Mirror Defect, has not issued any bulletins or instructions to its dealerships regarding the Mirror Defect, has not offered to its customers a suitable repair or replacement of parts related to the Mirror Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Mirror Defect.

143.    Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

144.    As a result of the Mirror Defect, the value of the Class Vehicles were worth less money at the time of sale.

145.    Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's side-view mirror is not defective and will not shake or vibrate under normal driving conditions. Plaintiffs and Class Members further expect and assume that Subaru will not sell or lease vehicles with known safety defects, such as the Mirror Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.  They do not expect that Subaru would fail to disclose the Mirror Defect to them, and then refused to remedy the defect under Subaru's warranty.

## **CLASS ACTION ALLEGATIONS**

### A.    ***The Class***

146.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(5), Plaintiffs seek to represent the following class:

**Texas Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent or 2023-2024 Subaru Solterra vehicle in the State of Texas (the "Texas Class")

**Alaska Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent or 2023-2024 Subaru Solterra vehicle in the State of Alaska (the "Alaska Class")

**California Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent or 2023-2024 Subaru Solterra vehicle in the State of California (the "California Class")

**Florida Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent or 2023-2024 Subaru Solterra vehicle in the State of Florida (the "Florida Class")

**Utah Class:** All persons or entities who purchased or leased any 2024 Subaru Crosstrek or 2024 Subaru Ascent or 2023-2024 Subaru Solterra vehicle in the State of Utah (the "Utah Class")

147.    Defendant and its employees or agents are excluded from the Class.

**B.    _Numerosity_**

148.    Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that thousands of Class Vehicles have been sold and leased nationwide and throughout Texas, Alaska, California, Florida, and Utah.

**C.    _Common Questions of Law and Fact_**

149.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.  These questions include:

a.    whether the Class Vehicles suffer from the Mirror Defect;

b.    whether the Mirror Defect constitutes an unreasonable safety hazard;

c.     whether Defendant knows about the Mirror Defect and, if so, how long Defendant has known of the Defect;

d.     whether the defective nature of the Class Vehicles' side-view mirrors constitutes a material defect;

e.     whether Defendant had and has a duty to disclose the defective nature of the Class Vehicles' side-view mirrors to Plaintiffs and the other Class Members;

f.     whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g.     whether Defendant knew or reasonably should have known of the Mirror Defect contained in the Class Vehicles before it sold or leased them to Class Members; and

h.     Whether Defendant breached its express warranty and the implied warranty of merchantability, engaged in fraudulent concealment and unjust enrichment, and whether Defendant violated the Texas Deceptive Practices Act, Tex. Bus. & Com. Code § 17.41, *et seq.*, Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann. § 45.50.471, *et seq.*, California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.201, *et seq.*, and Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*

**D.**   ***Typicality***

150.   The Plaintiffs' claims are typical of the claims of the Class since Plaintiffs purchased or leased defective Class Vehicles, as did each member of the Class. Furthermore,

Plaintiffs and all members of the Class sustained economic injuries arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

### E.   *Protecting the Interests of the Class Members*

151.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in handling class actions and claims involving unlawful business practices. Neither Plaintiffs nor their counsel have any interest which might cause them not to vigorously pursue this action.

### F.   *Proceeding Via Class Action is Superior and Advisable*

152.    A class action is the superior method for the fair and efficient adjudication of this controversy. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

153.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
**Fraudulent Concealment**
**(Plaintiffs on behalf of Alaska, California, Florida and Utah Classes only)**

154.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

155.    By affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' side-view mirrors from Plaintiffs and Class Members, Subaru concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

156.    Defendant knew that the Class Vehicles' side-view mirrors suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

157.    Defendant was under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles' side-view mirrors and/or the associated repair costs because:

a.    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' side-view mirrors;

b.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their side-view mirrors have a dangerous safety defect until after they purchased or leased the Class Vehicles; and,

38

      d.      Defendant knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

158.      On information and belief, Subaru still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Mirror Defect and the performance and quality of Class Vehicles.

159.      The facts concealed or not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

160.      Plaintiffs and Class Members relied on Defendant to disclose material information it knew, such as the defective nature of the side-view mirrors in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

161.      By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

162.      The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

163.      Had Plaintiffs and other Class Members known that the Class Vehicles suffer from the Mirror Defect, they would not have purchased the Class Vehicles or would have paid less for them.

164.      Plaintiffs and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

165.    As a result of Defendant's misconduct, Plaintiffs and the other Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement parts and are worth less money because of the Defect.

166.    Accordingly, Subaru is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

167.    Subaru's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, to enrich Subaru.  Subaru's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

168.    Furthermore, as the intended and expected result of its fraud and conscious wrongdoing,  Subaru has profited and benefited from Plaintiffs' and Class Members' purchase of Class Vehicles containing the Mirror Defect.  Subaru has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of Subaru's misconduct alleged herein, Plaintiffs and Class Members were not receiving vehicles of the quality, nature, fitness, or value that had been represented by Subaru, and that a reasonable consumer would expect.

169.    Subaru has been unjustly enriched by its fraudulent, deceptive, and otherwise unlawful conduct in connection with the sale and lease of Class Vehicles and by withholding benefits from Plaintiff and Class Members at the expense of these parties. Equity and good conscience militate against permitting Subaru to retain these profits and benefits, and Subaru

should be required to make restitution of its ill-gotten gains resulting from the conduct alleged herein.

170.    Plaintiffs seek damages and injunctive and equitable relief for themselves and for the Class.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(Plaintiffs on behalf of Texas, Alaska, California, Florida and Utah Classes)**

171.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

172.    Subaru has long known that about the Mirror Defect which it concealed and failed to disclose to Plaintiffs and Class Members.

173.    As a result of its fraudulent acts and omissions related to the Mirror Defect, Subaru obtained monies which rightfully belong to Plaintiffs and the Class Members to the detriment of Plaintiffs and Class Members.

174.    Subaru appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the proposed Class Members who, without knowledge of the Mirror Defect, paid a higher price for their vehicles which actually had lower values.  Subaru also received monies for vehicles that Plaintiffs and the Class Members would not have otherwise purchased or leased.

175.    It would be inequitable and unjust for Subaru to retain these wrongfully obtained profits.

176.    Subaru's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

177.    As a result of Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

178.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

179.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with misleading information concerning the Mirror Defect; compelling Defendant to provide Class Members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### THIRD CAUSE OF ACTION
**Money-Had-And-Received**
**(Plaintiff Robinson on behalf of the Texas Class)**

180.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

181.    Subaru has long known that about the Mirror Defect which it concealed and failed to disclose to Plaintiffs and Class Members.

182.    As a result of its fraudulent acts and omissions related to the Mirror Defect, Subaru obtained monies which rightfully belong to Plaintiff Robinson and the Texas Class Members to the detriment of Plaintiff Robinson and the Texas Class Members.

183.    Subaru appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff Robinson and the Texas Class Members who, without knowledge of the Mirror Defect, paid a higher price for their vehicles which actually had lower values.  Subaru also received monies for vehicles that Plaintiff Robinson and the Texas Class Members would not have otherwise purchased or leased.

184.    It would be inequitable and unjust for Subaru to retain these wrongfully obtained profits.

185.    Subaru's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

186.    Because of the Defendant's conduct specified above, Subaru took an undue advantage over Plaintiff Robinson and the Texas Class Members.

187.    As a result of Defendant's unjust enrichment, Plaintiff Robinson and the Texas Class Members have suffered damages.

188.    Plaintiff Robinson and the Texas Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

189.    Additionally, Plaintiff Robinson and the Texas Class Members seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff Robinson and the Texas Class Members also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with misleading information concerning the Mirror Defect; compelling Defendant to provide Class Members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the

Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## FOURTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability Pursuant to the
### Tex. Bus. & Com. Code § 2.314
### (Plaintiff Robinson on behalf of the Texas Class)

190.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

191.    Defendant is a merchant with respect to motor vehicles.

192.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Robinson and to Texas Class Members.

193.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

194.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the Mirror Defect referenced herein and thus were not in merchantable condition when Plaintiff Robinson and Texas Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles were purchased or leased to be used.  Specifically, the Class Vehicles suffer from side-view mirrors that vibrate, causing the reflection in the side-view mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

195.    As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value

of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## FIFTH CAUSE OF ACTION
**Breach of Express Warranty under Tex. Bus. & Com. Code Ann. § 2.313**
**(Plaintiff Robinson on behalf of the Texas Class)**

196.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

197.    In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff Robinson and Texas Class Members with its New Vehicle Limited Warranty where it promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes first.

198.    Plaintiff Robinson and Texas Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

199.    Plaintiff Robinson and Texas Class Members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class Member, by failing to repair the Mirror Defect under the vehicle's warranty within a reasonable period of time as described herein.

200.    Plaintiff Robinson and Texas Class Members have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

201.    As a result of said nonconformities, Plaintiff Robinson and Texas Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

202.    Plaintiff Robinson and Texas Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Robinson and Texas Class Members' acceptance of the Class Vehicles.

203.    Plaintiff Robinson and Texas Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Mirror Defect.

204.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff Robinson and Texas Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**SIXTH CAUSE OF ACTION**
**Violation of the Texas Deceptive Practices Act,**
**Tex. Bus. & Com. Code § 17.41, *et seq.***
**(Plaintiff Robinson on behalf of the Texas Class)**

205.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

206.    Plaintiff Robinson and Texas Class Members are each "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired their vehicle by purchase.

207.    Plaintiff Robinson's vehicle and Texas Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattel that were purchased or leased for use.

208.    Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

209.    At all relevant times, Defendant has engaged in "Trade" and "Commerce" as defined by Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

210.    Texas's Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*, prohibits and declares unlawful false, misleading, or deceptive business practices. in the conduct of any trade or commerce.

211.    Specifically, by affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' side-view mirror from Plaintiff Robinson and Texas Class Members, Subaru concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

212.    Defendant knew that the Class Vehicles' side-view mirrors suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

213.    Defendant was under a duty to Plaintiff Robinson and Texas Class Members to disclose the defective nature of the Class Vehicles' side-view mirrors and/or the associated repair costs because:

e.    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' side-view mirrors;

f.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

g.    Plaintiff Robinson and Texas Class Members could not reasonably have been expected to learn or discover that their side-view mirrors have a dangerous safety

defect until after they purchased the Class Vehicles, and the defective nature of the side-view mirror was not open and obvious; and,

h.      Defendant knew that Plaintiff Robinson and Texas Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

214.    On information and belief, Subaru still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Mirror Defect and the performance and quality of Class Vehicles.

215.    The facts concealed or not disclosed by Defendant to Plaintiff Robinson and Texas Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

216.    Plaintiff Robinson and Texas Class Members relied on Defendant to disclose material information it knew, such as the defective nature of the side-view mirrors in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

217.    By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

218.    The facts concealed or not disclosed by Defendant to Plaintiff Robinson and the other Texas Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

219.    Plaintiff Robinson and the other Texas Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

48

220.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiff Robinson and Texas Class Members.

221.    Defendant's intentional concealment of and failure to disclose the Mirror Defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Robinson and Texas Class Members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Robinson and Texas Class Members.

222.    Furthermore, Tex. Bus. & Com. Code § 17.50(a)(2) provides that a "consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (2) breach of an express or implied warranty."

223.    Defendant violated the DTPA by breaching its express and implied warranties. Defendant's breach of the express warranty and implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiff Robinson and Texas Class Members.

224.    The Class Vehicles' Mirror Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road, because the Class Vehicles suffer from side-view mirrors that vibrate, causing the reflection in the side-view mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

225.    As a result of Defendant's acts, Plaintiff Robinson and Texas Class Members have suffered damages in that they are left with vehicles of diminished value and utility because of the Mirror Defect, which continues to pose a serious safety risk.

49

226.    Moreover, Defendant's sale and lease of the defective Class Vehicles and failure to repair the Mirror Defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Robinson and Texas Class Members, that conduct took advantage of Plaintiff Robinson and Texas Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Robinson and Texas Class Members.

227.    Plaintiff Robinson and the other Texas Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect, which is the reasonable and objective consumer expectation for vehicles.

228.    As a result of Defendant's misconduct, Plaintiff Robinson and Texas Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement, and are worth less money because of the Mirror Defect.

229.    Plaintiff Robinson has provided adequate notice to Defendant.

**SEVENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability Pursuant to the**
**Alaska Stat. Ann. § 45.02.314**
**(Plaintiff Anders on behalf of the Alaska Class)**

230.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

231.    Defendant is a merchant with respect to motor vehicles.

232.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Anders and to Alaska Class Members.

233.     An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

234.     Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the Mirror Defect referenced herein and thus were not in merchantable condition when Plaintiff Anders and Alaska Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles were purchased or leased to be used.  Specifically, the Class Vehicles suffer from side-view mirrors that vibrate, causing the reflection in the side-view mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

235.     As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## EIGHTH CAUSE OF ACTION
### Breach of Express Warranty under Alaska Stat. Ann. § 45.02.313
### (Plaintiff Anders on behalf of the Alaska Class)

236.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

237.     In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff Anders and Alaska Class Members with its New Vehicle Limited Warranty where it promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes first.

238.    Plaintiff Anders and Alaska Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

239.    Plaintiff Anders and Alaska Class Members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class Member, by failing to repair the Mirror Defect under the vehicle's warranty within a reasonable period of time as described herein.

240.    Plaintiff Anders and Alaska Class Members have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

241.    As a result of said nonconformities, Plaintiff Anders and Alaska Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

242.    Plaintiff Anders and Alaska Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Anders and Alaska Class Members' acceptance of the Class Vehicles.

243.    Plaintiff Anders and Alaska Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Mirror Defect.

244.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff Anders and Alaska Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the

loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**NINTH CAUSE OF ACTION**
**Violation of the Alaska Unfair Trade Practices and Consumer Protection Act,**
**Alaska Stat. Ann. § 45.50.471, *et seq.***
**(Plaintiff Anders on behalf of the Alaska Class)**

245.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

246.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471.

247.    Specifically, by affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' side-view mirror from Plaintiff Anders and Alaska Class Members, Subaru concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

248.    Defendant knew that the Class Vehicles' side-view mirrors suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

249.    Defendant was under a duty to Plaintiff Anders and Alaska Class Members to disclose the defective nature of the Class Vehicles' side-view mirrors and/or the associated repair costs because:

    i.      Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' side-view mirrors;

    j.      Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

    k.      Plaintiff Anders and Alaska Class Members could not reasonably have been expected to learn or discover that their side-view mirrors have a dangerous safety defect until after they purchased the Class Vehicles; and,

    l.      Defendant knew that Plaintiff Anders and Alaska Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

250.    On information and belief, Subaru still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Mirror Defect and the performance and quality of Class Vehicles.

251.    The facts concealed or not disclosed by Defendant to Plaintiff Anders and Alaska Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

252.    Plaintiff Anders and Alaska Class Members relied on Defendant to disclose material information it knew, such as the defective nature of the side-view mirrors in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

253.    By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

254.    The facts concealed or not disclosed by Defendant to Plaintiff Anders and the other Alaska Class Members are material because a reasonable consumer would have considered

them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

255.    Plaintiff Anders and the other Alaska Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

256.    Those "unfair or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiff Anders and Alaska Class Members.

257.    Plaintiff Anders and the other Alaska Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect, which is the reasonable and objective consumer expectation for vehicles.

258.    As a result of Defendant's misconduct, Plaintiff Anders and Alaska Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement, and are worth less money because of the Mirror Defect.

259.    Pursuant to Alaska Stat. Ann. § 45.50.531, Plaintiff Anders seeks monetary relief against Defendant measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for Plaintiff Anders and each Alaska Class Member.

260.    Plaintiff Anders also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

261.    Plaintiff Anders has provided adequate notice to Defendant.

**TENTH CAUSE OF ACTION**
**Breach of Implied Warranty pursuant to Song-Beverly**
**Consumer Warranty Act – Cal. Civ. Code §§ 1792 and 1791.1, *et seq.***
**(Plaintiff Brenner on behalf of the California Class)**

262.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

263.    Defendant is a merchant with respect to motor vehicles.

264.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Brenner and to California Class Members.

265.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

266.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the Mirror Defect referenced herein and thus were not in merchantable condition when Plaintiff Brenner and California Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles were purchased or leased to be used.  Specifically, the Class Vehicles suffer from side-view mirrors that vibrate, causing the reflection in the side-view mirror to become distorted and impeding driver's ability to observe traffic, that makes driving such Class Vehicles dangerous and illegal.

267.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

268.    As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value

of their Class Vehicles. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## ELEVENTH CAUSE OF ACTION
### Breach of Express Warranty under Cal. Comm. Code § 2313
### (Plaintiff Brenner on behalf of the California Class)

269. Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

270. In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff Brenner and California Class Members with its New Vehicle Limited Warranty where it promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes first.

271. Plaintiff Brenner and California Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

272. Plaintiff Brenner and California Class Members submitted their Vehicles for warranty repairs as referenced herein. Defendant failed to comply with the terms of the express written warranty provided to each Class Member, by failing to repair the Mirror Defect under the vehicle's warranty within a reasonable period of time as described herein.

273. Plaintiff Brenner and California Class Members have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

274. As a result of said nonconformities, Plaintiff Brenner and California Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

275.    Plaintiff Brenner and California Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Brenner and California Class Members' acceptance of the Class Vehicles.

276.    Plaintiff Brenner and California Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Mirror Defect.

277.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff Brenner and California Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

## TWELFTH CAUSE OF ACTION
### Breach of Express Warranty Pursuant to Song-Beverly Consumer Warranty Act – Cal. Civ. Code §§ 1793.2(d) and 1791.2, *et seq.* (Plaintiff Brenner on behalf of the California Class)

278.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

279.    Plaintiff Brenner and each California Class Member is a "buyer" as defined in Cal. Civ. Code § 1791(b).

280.    Defendant is a "manufacturer" as defined in Cal. Civ. Code § 1791(j).

281.    Each Class Vehicle is a "consumer good" as defined in Cal. Civ. Code § 1791(a).

282.    Cal. Civ. Code § 1794 provides a cause of action for any consumer who is damaged by the failure of a manufacturer to comply with an express warranty.

283.    In connection with the sale of the Class Vehicles to Plaintiff Brenner and California Class Members, Defendant provided Plaintiff Brenner and California Class Members with express warranties within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

284.    Specifically, in connection with the sale the Class Vehicles to Plaintiff Brenner and California Class Members, Defendant provided Plaintiff Brenner and California Class Members with a New Vehicle Limited Warranty, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the Class Vehicle's side-view mirrors.

285.    Plaintiff Brenner and California Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

286.    Defendant breached this express warranty in that the Class Vehicles suffer from the above-described defects, which substantially impair the Class Vehicles' use, safety, and value to Plaintiff Brenner and California Class Members.

287.    Plaintiff Brenner and California Class Members have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable to do so within a reasonable time.

288.    As a result of said nonconformities, Plaintiff Brenner and California Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

289.    Plaintiff Brenner and California Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Brenner and California Class Members' acceptance of the Class Vehicles.

290.    Plaintiff Brenner and California Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to the time of purchase or lease, that the Class Vehicles' side-view mirrors did not function as advertised and warranted.

291.    As a result of Defendant's breach of express warranty Plaintiff Brenner and California Class Members have been damaged and, therefore, bring this claim pursuant to California Civil Code § 1794.

292.    Defendant's failure to comply with its obligations under § 1793.2(d) was willful, in that Defendant and its authorized dealerships were aware that they were unable to service or repair the Class Vehicles to conform to the applicable express warranties after a reasonable number of repair attempts, yet Defendant failed and refused to promptly replace the Class Vehicles or make restitution despite the demand.  Accordingly, Plaintiff Brenner and California Class Members are entitled to a civil penalty of two times their actual damages pursuant to Cal. Civ. Code § 1794(c).

### THIRTEENTH CAUSE OF ACTION
**Breach of Express Warranty Pursuant to Song-Beverly**
**Consumer Warranty Act – Cal. Civ. Code §§ 1793.2(b) and 1791.2, *et seq.***
**(Plaintiff Brenner on behalf of the California Class)**

293.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

294.    Although Plaintiff Brenner and California Class Members presented the Class Vehicles to Defendant's authorized dealerships, which are Defendant's representatives in the state of California, Defendant and its representatives failed to commence the service or repairs within a reasonable time and failed to service or repair the Class Vehicles so as to conform to the applicable warranties within 30 days, in violation of Cal. Civ. Code § 1793.2(b).  Plaintiff

Brenner and California Class Members did not extend the time for completion of repairs beyond the 30-day requirement.

295.    Cal. Civ. Code § 1794 provides a cause of action for any consumer who is damaged by the failure of a manufacturer to comply with its obligations pursuant to Cal. Civ. Code § 1793.2(b).

296.    Plaintiff Brenner and California Class Members have rightfully rejected and/or justifiably revoked acceptance of the Class Vehicles, and have exercised a right to cancel the sale.  By serving this Complaint, Plaintiff Brenner and California Class Members do so again. Accordingly, Plaintiff Brenner and California Class Members seek the remedies provided in Cal. Civ. Code §1794(b)(1), including the entire purchase price.  In the alternative, Plaintiff Brenner and California Class Members seek the remedies set forth in Cal. Civ. Code § 1794(b)(2), including the diminution in value of the Class Vehicles resulting from the Mirror Defect.

297.    Defendant's failure to comply with its obligations under Cal. Civ. Code § 1793.2(b) was willful, in that Defendant and its representatives were aware that they were obligated to service or repair the Class Vehicles to conform to the applicable express warranties within 30 days, yet they failed to do so.  Accordingly, Plaintiff Brenner and California Class Members are entitled to a civil penalty of two times their actual damages pursuant to pursuant to Cal. Civ. Code § 1794(c).

### FOURTEENTH CAUSE OF ACTION
**Violation of the California Consumers Legal Remedies Act,**
**Cal. Civil Code §§ 1750, *et seq.***
**(Plaintiff Brenner on behalf of the California Class)**

298.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

299.    The California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq*. ("CLRA") prohibits various deceptive practices in connection with the conduct of a business providing goods, property, or services to consumers primarily for personal, family, or household purposes.  The self-declared purposes of the CLRA are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection. Cal. Civil Code § 1760.

300.    Defendant is a "person" as defined in Cal. Civil Code § 1761(c).

301.    Plaintiff Brenner and California Class Members are "consumers" as defined in Cal. Civil Code § 1761(d).

302.    The Class Vehicles constitute "goods" and "services," as defined by Cal. Civ. Code § 1761(a) and (b).

303.    Plaintiff Brenner and California Class Members' purchases or leases of the Class Vehicles constitute "transactions," as defined by Cal. Civ. Code § 1761(e).

304.    Plaintiff Brenner and California Class Members purchased or leased the Class Vehicles for personal, family, and household purposes, as defined by Cal. Civ. Code § 1761(d).

305.    Defendant violated California Civil Code § 1770(a)(5), (7), (14), and (16) when it sold or leased Plaintiff Brenner and California Class Members the Class Vehicles with knowledge that they contained the Mirror Defect and knowingly concealed said defects from Plaintiff Brenner and California Class Members with the intent that they rely upon Defendant's concealment.

306.    The Class Vehicles' Mirror Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road.  Defendant had exclusive knowledge of the defect and has actively concealed it from consumers.

307. In the course of Defendant's business, Defendant willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the Mirror Defect, which manifests in all or substantially all of the Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to hundreds and even thousands of dollars in repair expenses, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

308. In purchasing or leasing the Class Vehicles, Plaintiff Brenner and California Class Members were deceived by Defendant's failure to disclose that the Class Vehicles suffered from the Mirror Defect as described above, or that Defendant would not repair or replace such defect as required under applicable warranties.

309. In purchasing or leasing the Class Vehicles, Plaintiff Brenner and California Class Members were deceived by Defendant's failure to disclose that the Class Vehicles' side-view mirrors are substantially likely to shake and flutter in the course of ordinary use of the Class Vehicles.

310. Defendant owed Plaintiff Brenner and California Class Members a duty to disclose the truth about the Mirror Defect because:

a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' side-view mirrors;

b. Defendant knew that the Class Vehicles and their side-view mirrors suffered from an inherent defect, were defectively made and/or manufactured, and were not suitable for their intended use;

    c.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their side-view mirrors; and

    d.   Defendant actively concealed the defective nature of the Class Vehicles and their side-view mirrors from Plaintiff Brenner and California Class Members.

311.    Defendant intentionally and knowingly concealed material facts regarding the Class Vehicles with an intent to mislead Plaintiff Brenner and California Class Members.

312.    Plaintiff Brenner and California Class Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading.

313.    Plaintiff Brenner and California Class Members were unaware of the Mirror Defect and would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, of such defects in the Class Vehicles.

314.    As a result of Defendant's acts, Plaintiff Brenner and California Class Members have suffered damages. Plaintiff Brenner and California Class Members would not have purchased or leased Class Vehicles had the Mirror Defect and associated risks and costs been disclosed to them.  They are left with vehicles of diminished value and utility because of such defect, which continues to pose a safety risk and will continue to require future repairs and replacement parts at Class Vehicle owners' expense.

315.    Plaintiff Brenner seeks an order requiring Defendant to immediately disclose the existence of the Mirror Defect and associated risks to all existing and prospective customers, to

repair the defect in Class Vehicles free of charge, and to cease selling new or certified pre-owned Class Vehicles through its dealerships until the defect is remedied.

316.    Plaintiff Brenner provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  To date, Defendant has failed to provide appropriate relief for its violations of the CLRA. Therefore, Plaintiff Brenner and California Class Members seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

**FIFTEENTH CAUSE OF ACTION**
**Violation of California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Plaintiff Brenner on behalf of the California Class)**

317.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

318.    California's Unfair Competition Law ("UCL"), California's Bus. & Prof. Code, § 17200, prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

319.    The Class Vehicles' Mirror Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road. Defendant had exclusive knowledge of the defect and has actively concealed it from consumers.

320.    In the course of Defendant's business, Defendant willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the Mirror Defect, which manifests in all or substantially all of the Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to hundreds and even thousands of dollars in repair expenses, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

321.    In purchasing or leasing the Class Vehicles, Plaintiff Brenner and California Class Members were deceived by Defendant's failure to disclose that the Class Vehicles suffer from the Mirror Defect as described above, or that Defendant would not cure such defect as required under applicable warranties.

322.    In purchasing or leasing the Class Vehicles, Plaintiff Brenner and California Class Members were deceived by Defendant's failure to disclose that the Class Vehicles' side-view mirrors are substantially likely to shake and flutter in the course of ordinary vehicle operation.

323.    Defendant owed Plaintiff Brenner and California Class Members a duty to disclose the truth about the Mirror Defect because:

a.  Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' side-view mirrors;

b.  Defendant knew that the Class Vehicles and their side-view mirrors suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use;

c.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their side-view mirrors; and

d.  Defendant actively concealed the defective nature of the Class Vehicles and their side-view mirrors from Plaintiff Brenner and California Class Members.

324.    Defendant intentionally and knowingly concealed material facts regarding the Class Vehicles with the intent to mislead Plaintiff Brenner and California Class Members.

325.    Plaintiff Brenner and California Class Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading.

326.    Plaintiff Brenner and California Class Members were unaware of the Mirror Defect and that the Class Vehicles' side-view mirrors are substantially likely to fail in the course of normal everyday driving conditions and would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, of such defects in the Class Vehicles.

327.    Plaintiff Brenner and California Class Members are reasonable consumers who do not expect their vehicles to suffer from the Mirror Defect.

328.    Defendant knew the Class Vehicles and their side-view mirros suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

329.    In failing to disclose the defects with the Class Vehicles' side-view mirrors, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

330.    The facts Defendant concealed from or failed to disclose to Plaintiff Brenner and California Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles.  Had Plaintiff Brenner and California Class Members known that the Class Vehicles suffered from the Mirror Defect and posed a safety hazard, they would not have purchased or leased the Class Vehicles or would have paid less for them.

331.    Defendant continued to conceal the defective nature of the Class Vehicles and the Mirror Defect even after the Class Members began to report problems.

332.    Defendant's conduct was and is likely to deceive consumers.

333.    Defendant's acts, conduct and practices were unlawful, in that they constituted:

    a.    Violations of the California Consumer Legal Remedies Act;

    b.    Violations of the Song-Beverly Consumer Warranty Act; and

    c.    Violations of the express warranty provisions of California Commercial Code section 2313.

334.    By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

335.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

336.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff Brenner and California Class Members have suffered and will continue to suffer actual damages.

337.    The Class Vehicles are worth less with the Mirror Defect.

338.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiff Brenner and California Class Members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

339.    Further, Plaintiff Brenner seeks an order enjoining Defendant from committing such unlawful, unfair, and fraudulent business practices, and seek the full amount of money Plaintiff Brenner and California Class Members paid for the Class Vehicles and/or restitutionary

disgorgement of profits from Defendant. Plaintiffs also seek attorneys' fees and costs under Cal

Code Civ. Proc. § 1021.5.

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Express Warranty under F.S.A. § 672.313**
**(Plaintiff Taylor on behalf of the Florida Class)**

340.    Plaintiffs incorporate by reference all allegations contained in this Complaint as

though fully stated herein.

341.    In connection with the sale or lease of the Class Vehicles, Defendant provided

Plaintiff Taylor and Florida Class Members with its New Vehicle Limited Warranty where it

promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes

first.

342.    Plaintiff Taylor and Florida Class Members relied on Defendant's warranty when

they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the

basis of the bargain.

343.    Plaintiff Taylor and Florida Class Members submitted their Vehicles for warranty

repairs as referenced herein. Defendant failed to comply with the terms of the express written

warranty provided to each Class Member, by failing to repair the Mirror Defect under the

vehicle's warranty within a reasonable period of time as described herein.

344.    Plaintiff Taylor and Florida Class Members have given Defendant reasonable

opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within

a reasonable time.

345.    As a result of said nonconformities, Plaintiff Taylor and Florida Class Members

cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable,

comfortable, and efficient transportation.

346.    Plaintiff Taylor and Florida Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Taylor and Florida Class Members' acceptance of the Class Vehicles.

347.    Plaintiff Taylor and Florida Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Mirror Defect.

348.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff Taylor and Florida Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**EIGHTEENTH CAUSE OF ACTION**
**Violation of Florida Deceptive and Unfair Trade Practices Act,**
**F.S.A. § 501.201, *et seq.***
**(Plaintiff Taylor on behalf of the Florida Class)**

349.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

350.    Plaintiff Taylor and the Florida Class Members are each an "interested party or person" and "consumer" as defined by F.S.A. 501.203(6) and (7) respectively.

351.    At all relevant times, Defendant has engaged in "Trade" and "Commerce" as defined by F.S.A. 501.203(8) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Florida, directly or indirectly affecting Florida citizens though that trade and commerce.

352.    The allegations set forth herein constitute false, misleading, unlawful or deceptive trade practice under F.S.A. 501.201, *et seq*.

353.    By failing to disclose and concealing the Mirror Defect from Plaintiff Taylor and Florida Class Members, Defendant violated the Florida Deceptive and Unfair Trade Practices Act as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

354.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

355.    Defendant knew that the Class Vehicles suffered from the Murror Defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

356.    Defendant was under a duty to Plaintiff Taylor and Florida Class Members to disclose the defective nature of the Class Vehicles because:

a.    Defendant was in a superior position to know the true state of facts about the Mirror Defect contained in the Class Vehicles;

b.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.    Plaintiff Taylor and Florida Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

d.    Defendant knew that Plaintiff Taylor and Florida Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

357.    The facts concealed or not disclosed by Defendant to Plaintiff Taylor and Florida Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

358.    Plaintiff Taylor and Florida Class Members relied on Defendant to disclose material information it knew, such as the Mirror Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

359.    By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

360.    Moreover, Defendant's intentional concealment of and failure to disclose the Mirror Defect took advantage of Plaintiff Taylor and Florida Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.

361.    The facts concealed or not disclosed by Defendant to Plaintiff Taylor and Florida Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

362.    Had Plaintiff Taylor and Florida Class Members known that the Class Vehicles would suffer from the Mirror Defect, they would not have purchased the Class Vehicles or would have paid less for them.

363.    Plaintiff Taylor and Florida Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect.  That is the reasonable and objective consumer expectation for vehicles.

364.    As a result of Defendant's misconduct, Plaintiff Taylor and Florida Class Members have been harmed and have suffered actual and economic damages in that the Class

Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

365.    Plaintiff Taylor has provided adequate notice to Defendant.

366.    Plaintiff Taylor and Florida Class Members should be awarded punitive damages because Defendant intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

## <u>NINETEENTH CAUSE OF ACTION</u>
### Breach of Express Warranty under Utah Code Ann. § 70A-2-313
### (Plaintiff Chaidez on behalf of the Utah Class)

367.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

368.    In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff Chaidez and Utah Class Members with its New Vehicle Limited Warranty where it promised to repair defective parts within 36 months or 36,000 miles in service, whichever comes first.

369.    Plaintiff Chaidez and Utah Class Members relied on Defendant's warranty when they agreed to purchase or lease the Class Vehicles, and Defendant's warranty was part of the basis of the bargain.

370.    Plaintiff Chaidez and Utah Class Members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class Member, by failing to repair the Mirror Defect under the vehicle's warranty within a reasonable period of time as described herein.

371.    Plaintiff Chaidez and Utah Class Members have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

372.    As a result of said nonconformities, Plaintiff Chaidez and Utah Class Members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

373.    Plaintiff Chaidez and Utah Class Members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Chaidez and Utah Class Members' acceptance of the Class Vehicles.

374.    Plaintiff Chaidez and Utah Class Members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Mirror Defect.

375.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranty, Plaintiff Chaidez and Utah Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**TWENTIETH CAUSE OF ACTION**
**Violation of the Utah Consumer Sales Practices Act,**
**Utah Code Ann. § 13-11-1, *et seq.***
**(Plaintiff Chaidez on behalf of the Utah Class)**

376.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

377.    Plaintiff Chaidez, the Utah Class Members, and Defendant are each a "person" under Utah Code Ann. § 13-11-3(5).

378.    Defendant is a "supplier" under Utah Code Ann. § 13-11-3(6) because Defendant, directly or indirectly, regularly solicits, engages in, or enforces consumer transactions in the United States, including Utah.

379.    At all relevant times, Defendant has engaged in "consumer transactions[s]" under Utah Code Ann. § 13-11-3(2) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Utah, directly or indirectly affecting Utah citizens through that trade and commerce.

380.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-4.

381.    By failing to disclose and concealing the Mirror Defect from Plaintiff Chaidez and Utah Class Members, Defendant violated the Utah Consumer Sales Practices Act as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

382.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

383.    Defendant knew that the Class Vehicles suffered from the Mirror Defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

384.    Defendant was under a duty to Plaintiff Chaidez and Utah Class Members to disclose the defective nature of the Class Vehicles because:

a.  Defendant was in a superior position to know the true state of facts about the Mirror Defect contained in the Class Vehicles;

b.  Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.  Plaintiff Chaidez and Utah Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

d.  Defendant knew that Plaintiff Chaidez and Utah Class Members could not reasonably have been expected to learn about or discover the Mirror Defect.

385.  The facts concealed or not disclosed by Defendant to Plaintiff Chaidez and Utah Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

386.  Plaintiff Chaidez and Utah Class Members relied on Defendant to disclose material information it knew, such as the Mirror Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

387.  By failing to disclose the Mirror Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

388.  Moreover, Defendant's intentional concealment of and failure to disclose the Mirror Defect constitutes an "unconscionable act or practice" under Utah Code Ann. § 13-11-5 because, to the detriment of Plaintiff Chaidez and Utah Class Members, that conduct took advantage of Plaintiff Chaidez and Utah Class Members' lack of knowledge, ability, and

experience to a grossly unfair degree. That "unconscionable act or practice" was a producing cause of the economic damages sustained by Plaintiff Chaidez and Utah Class Members.

389.    The facts concealed or not disclosed by Defendant to Plaintiff Chaidez and other Utah Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

390.    Had Plaintiff Chaidez and other Utah Class Members known that the Class Vehicles would suffer from the Mirror Defect, they would not have purchased the Class Vehicles or would have paid less for them.

391.    Plaintiff Chaidez and the other Utah Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Mirror Defect. That is the reasonable and objective consumer expectation for vehicles.

392.    As a result of Defendant's misconduct, Plaintiff Chaidez and the other Utah Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

393.    Plaintiff Chaidez has provided adequate notice to Defendant.

394.    Plaintiff Chaidez and Utah Class Members should be awarded punitive damages because Defendant intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

395.    Additionally, Plaintiff Chaidez and Utah Class Members seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff Chaidez and Utah Class Members also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining

Defendant from selling the Class Vehicles with misleading information concerning the Mirror Defect; compelling Defendant to provide Class Members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

a. An order certifying the proposed Classes, designating Plaintiffs as named representatives of the respective Classes, and designating the undersigned as Class Counsel;

b. An order awarding Plaintiffs and Class Members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c. An order awarding Plaintiffs and the Class restitution, disgorgement, or other equitable relief as the Court deems proper;

d. Equitable relief including, but not limited to, replacement of the Class Vehicles with new vehicles, or repair of the defective Class Vehicles with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

e.   A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

f.   Reasonable attorneys' fees and costs;

g.   Pre-judgment and post-judgment interest, as provided by law;

h.   Plaintiffs demand that Defendant performs a recall, and repair all Class Vehicles; and

i.   Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: December 16, 2024

KATELYN ROBINSON, MICHELLE ANDERS, MICHAEL BRENNER, RICARDO CHAIDEZ, JESSICA TAYLOR, *ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED*,

By   /s/ *Sergei Lemberg*

Sergei Lemberg, Esq.
LEMBERG LAW, LLC
43 Danbury Road
Wilton, CT 06897
Phone: (203) 653-2250
Fax:    (203) 653-3424
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 16, 2024, I caused a copy of a First Amended Class Action Complaint in this matter to be electronically filed with the Clerk of the United States District Court, District of New Jersey and that a copy of these documents will also be served on all counsel of record via the court's CM/ECF.

By   */s/ Sergei Lemberg*
Sergei Lemberg, Esq.